Ronald **BRISBON** and Michael Wonson, Appellants,

v.

**UNITED STATES, Appellee.**

Nos. 02–CF–601, 02–CF–777, 04–CO–144.

District of Columbia Court of Appeals.

Argued April 18, 2006.
Decided Oct. 9, 2008.

Michael L. Spekter, Washington, for appellant Ronald Brisbon.

Peter H. Meyers, Washington, for appellant Michael Wonson.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and John R. Fisher, Assistant United States Attorney at the time the brief was filed, Elizabeth Trosman, Emory V. Cole, and Joan Draper, Assistant United States Attorneys, were on the brief for appellee.

Before RUIZ, Associate Judge, FARRELL, Associate Judge, Retired,[*] and BELSON, Senior Judge.

RUIZ, Associate Judge:

Appellants Ronald Brisbon and Michael Wonson appeal their convictions for first-degree murder, assault with intent to kill and related offenses. Brisbon challenges the admission of his videotaped confession claiming it was involuntary, the denial of his motion for mistrial after an unanticipated month-long delay midway through the trial, and the admission of other crimes evidence. Wonson challenges the denial of his motion for severance as well as the denial of his post-conviction § 23–110 motion claiming ineffective assistance of counsel in that his lawyer did not present an alibi defense promised in opening statement. Both appellants argue that the prosecutor's closing argument improperly shifted the burden of proof to the defense and should have led to mistrial. We conclude that none of Brisbon's claims of error requires reversal of his convictions, which we affirm. Although we consider that the deceptive tactic used by the officers in interrogating Brisbon make the question of voluntariness a close question, we conclude that admission of his videotaped confession was harmless in light of the government's otherwise overwhelming evidence against him. We agree, however, with Wonson's claim that he was prejudiced by the admission of Brisbon's unredacted out of court confessions—which also incriminated Wonson in the charged murders—at their joint trial, and by the trial court's denial of his motion to sever and institute a separate trial against him. We, therefore, reverse Wonson's convictions and remand for a new trial.

## I.

### The Trial

Because the strength of the government's case is dispositive with respect to several of the legal challenges raised by appellants, we recount the evidence presented at trial in detail.

### Dana Route's Testimony

Dana Route testified that at the time of the crime, she was "Ronnie T" Brisbon's ex-girlfriend; they remained friends and worked together at C & T Auto Shop in Fort Washington, Maryland. On the eve-

---

[*] Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on July 1, 2008.

ning of Tuesday, May 16, 2000, she went with Brisbon in her Honda to meet "Pretty B" Wonson and two other men at the 4600 block of Hillside Road, S.E., where they bought a black Ford F-150 truck from Michael Cobb for $60. Wonson drove the truck away.

The next day, around 9 p.m. on Wednesday, May 17, 2000, Brisbon and Ms. Route picked up Wonson in Ms. Route's car and drove to where Wonson had parked the truck behind an apartment building on Benning Road. Wonson then went into the woods near the truck and returned to the car. The three went to Brisbon's grandmother's house. While there, Ms. Route saw Brisbon cleaning two rifles with WD-40 while Wonson stood nearby. Appellants each grabbed a gun and Brisbon invited Ms. Route to accompany them. She refused to go, but gave appellants the keys to her car. She recalled that Brisbon was wearing a black ballcap, black T-shirt, and blue jeans. Brisbon and Wonson returned in under twenty-five minutes, guns still in hand. After they came into the house, Brisbon said to Wonson, "I can't believe that your gun jammed."

About fifteen minutes later, all three left the grandmother's house in Ms. Route's car, with one of the appellants concealing the guns in a black shirt. Wonson got out in an alley behind the grandmother's house. Brisbon drove the truck to Prince George's County while Ms. Route followed him in her car. Brisbon parked the truck in a residential neighborhood and set fire to it with a lit napkin. They then went to Brisbon's house in Ms. Route's car for the night.

The following day, Thursday, May 18, 2000, Ms. Route was watching the news on TV while at work when she saw a report "that two people were killed on East Capi-

tol Street" and that "a burnt truck" was suspected as being involved. Ms. Route put two and two together and confronted Brisbon. At first, Brisbon denied killing anyone, but then recounted a version of events that made it fairly obvious that he did. Specifically, Ms. Route testified, Brisbon told her that "Pretty B [Wonson] was looking for somebody," and when he and Brisbon spotted the target, "Pretty B had got out of the truck and fired [bullets] into a crowd." Brisbon told her that he saw a car trying to evade them by making a U-turn, so he shot at that car, and saw that "the person in the car had slumped over the steering wheel." Ms. Route was impeached with her initial statements to the police denying any knowledge of the crime to the police. She said that her parents, who are retired police officers, convinced her to testify after explaining that she could be considered an accessory-after-the-fact or a perjurer if she failed to tell the truth to the grand jury or at trial.

### Michael Cobb's Testimony

Michael Cobb, testifying with use of immunity with respect to charges involving the stolen Ford truck, claimed that he sold the Ford F-150 truck to Brisbon. He remembered that appellants arrived in a small car which may have been a Honda. Cobb recalled that Brisbon—whom he knew as "T"—was talking about fighting "them," but didn't know who "them" referred to.[1] When shown a photo array, he recognized Wonson because his hair was styled in dreadlocks and identified both Brisbon and Wonson from the array; he also identified the burned Ford F-150 truck as the one he had sold.

### Eyewitnesses to the Murders

Nikita Sweeney testified that she was the one who made the U-turn that caught

---

1. According to Cobb, "He [Brisbon] was like I'm gonna fuck them niggers up or something. He was like my man was wrecking and I'm something, about fucking somebody up." "Wrecking" means "fighting."

Brisbon's eye. She had dropped off and was waiting for her friend, murder victim Ivory Harrison, who was looking for her lost purse at Eastern Senior High School at around 11 p.m. on May 17. According to Ms. Sweeney, there was a crowd of about fifteen to twenty people gathered in front of the school, drinking and talking. As she started the U-turn, she saw "a boy" get out of a "black pickup truck" and fire, first into the air, and then into the crowd of people outside the high school. When he then "point[ed] his gun towards" her, she hid under her dashboard. As she opened her eyes, Ivory Harrison had gotten back in the car, but both young women decided to crawl out of the car's passenger side door to escape the shots that were still being fired at their car. Almost as soon as they started, however, both were shot. They tried to run to safety; Ms. Harrison was too injured to run, but Ms. Sweeney, who had been shot in the left leg, made it to a group home across the street, from where she was taken to D.C. General and hospitalized for a month. Ms. Sweeney could not say how many shots were fired, but she thought they came from an automatic gun that looked like a rifle, and that the shots had been fired in a steady stream without any break. She was not able to pick her assailant out of a photo array,[2] but she was certain that he was a black male dressed in "all black," including a "black baseball cap," and that he had gotten out from the passenger side of the black pickup truck. She also said that there was only one person shooting and that the shooter had only one gun.

Seventeen-year-old Jameice Phillips testified that she was around Eastern High that night talking in a group of about thirty people, when a "black pickup truck

pulled up." She saw the passenger come out of the truck,[3] and fire "one big loud gunshot," "a loud boom" and then "a lot of other gunshots." Her friend "Peabo," Charles Jackson, was one of the persons shot dead. According to Ms. Phillips, there was only one shooter, who was wearing a bandanna or scarf across the forehead; she did not see the driver. She identified Brisbon, whom she knew from her neighborhood for about five years as "Ronnie T," as the shooter.

Metro Transit Police Officer Eric Croom was patrolling the area, which is near the Stadium–Armory Metro station, when he heard gunshots. At what he estimated to be 11:25 p.m. he saw through his rear view mirror a car stopped horizontally in the middle of the street about a block and a half away, then saw the flash of gunshots coming from the driver's side. He immediately radioed the Metropolitan Police and began assisting the victims. He saw Ms. Harrison lying on the ground by Ms. Sweeney's car, and found Mr. Jackson, bleeding from the head, without a pulse. He could not describe the person who fired the shots, but thought there was only one shooter, because he saw a "series" of flashes from what appeared to be a single gun muzzle.

### Experts and Physical Evidence

Metropolitan Police Department Firearms Examiner Michael Mulderig took the stand as a firearms expert. He testified that on May 31 he began his examination of the 45 shell casings (caliber of 7.62 mm.) that were recovered outside the school. He concluded that they could have been fired from an assault rifle, such as an AK–47, and that the shell casings had been fired from two different rifles. Corrobo-

---

2. When shown the array, Ms. Sweeney testified, she picked out someone (not either appellant) who looked "a little bit" like the shooter, but she was "not sure."

3. Ms. Phillips was impeached with her testimony to the grand jury, where she testified that the passenger shot out the window.

rating Ms. Route's testimony that Brisbon said to Wonson, "I can't believe your gun jammed," he testified that one cartridge found at the murder scene "was attempted to be fired but did not fire."

James Sullivan, a fire investigation expert, testified that the Ford F–150 truck was set on fire with a "lit ordinary combustible" on the front passenger seat, which also corroborated Ms. Route's testimony.

### Police Testimony Regarding Brisbon's Confession

Brisbon was arrested at 11:30 a.m. on May 24 at his place of work (C & T Auto Shop) by the Prince George's County, Maryland police. He was wearing a bullet-proof vest. D.C. Metropolitan Police Department Detectives Michael Irving and J.O. Johnson arrived at the police station in Prince George's County between 3–4 p.m. that day. Detective Irving gave Brisbon a hamburger and Brisbon agreed to waive his extradition rights, but they did not discuss the shooting. The detectives then drove Brisbon to the District of Columbia in a patrol car, chatting idly, and did not talk about the shooting.

Once they arrived at the D.C. police station, Detective Irving took Brisbon to an interrogation room and told him that he was under arrest for two murders on May 17, and had been "identified as being a shooter that night." The detective "told [Brisbon] just to listen and let [Det. Irving] tell him what [the police] knew about the case and what he was being charged for." Detectives Credle and Irving testified that they did not ask Brisbon any questions or discuss the facts of the case further until Brisbon signed the PD–47 form waiving his *Miranda* rights at 7:14 p.m. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)

The detectives then began interrogating Brisbon, and, during the first fifteen minutes, Brisbon denied everything. Detective Irving told him that they had searched the house where Brisbon lived with his mother and grandmother and "that the police recovered drugs and a shotgun out of his grandmother's house,"—which was true—and "that his grandmother had got upset and was rushed to the hospital and that his mother was placed under arrest"—which was false. According to the detectives, Brisbon dropped his head and was quiet for a few seconds, then admitted that he "did it," saying that he did not "want anyone else to get in trouble." Detectives Irving and Credle insisted that Brisbon give them all of the details of the crime, because a blanket confession would not convince them that he had told the truth. The detectives denied promising Brisbon that confessing would aid his mother or grandmother. The interrogation continued for two hours, until, at around 9:30 p.m., Brisbon consented to a videotaped confession.

### Confession Videotape

Brisbon's videotaped confession, given on May 24, the day he was arrested, was introduced during the government's case-in-chief. To avoid tainting Wonson's trial, however, the trial judge originally permitted the jury to see only a redacted version of the videotape, which excised all references to Wonson's involvement. The trial judge told the jury that the excised portions were legally irrelevant.

In the redacted videotaped confession, Brisbon said that he bought the truck from "George" and "someone else." He then drove both men home in Dana Route's Toyota. He said that his motive for the shooting was revenge for an unidentified "friend" who had been assaulted in a club. Brisbon recounted the drive-by shooting with himself as the driver and the friend as the passenger, and remembered such details as cleaning the weapons with WD–40 beforehand, as Ms. Route had testified. He also claimed that he turned the truck

over to someone else to be burned.[4] Toward the end of the confession, the detective asked Brisbon, "what would you say . . . If I told you that all the shell casings that were out there . . . all came from the same gun"? Brisbon answered, "that's impossible."

### Brisbon's Testimony

Brisbon, who was in his mid twenties, took the stand at trial. He denied any involvement in the crimes and explained that the videotaped confession was a fabrication produced under detailed police direction during two hours he spent alone with Detective Irving, and under severe emotional duress, because of the lies the detectives had told him about his mother's and grandmother's distress. He testified that after "at least like eight to nine hours" in custody and "four or five hours" of denying involvement, and repeatedly asking about his family ("like maybe 20 or more" times) the police told him that his mother and grandmother were "locked up" as a result of the contraband found during the search of their house. According to Brisbon, he told the officers that he "was willing to take the charge of whatever they found at her house," but "the police told [him] I couldn't do it unless [he told] them what they wanted to hear." He thought that his ex-girlfriend, Dana Route also had been arrested as an accessory in the shooting deaths, and he wanted to keep her out of it. Brisbon testified that he had falsely implicated Wonson in his confession because the detective told him two guns had been involved in the shooting and he wanted to protect his family and to avoid the version that the police were trying to get him to confess to, in which he, and Dana Route were the shooters. He claimed that Wonson was a vague acquaintance whose name he did not even know until Detective Irving mentioned him.

To rebut Brisbon's testimony, the prosecutor played the entire, unredacted videotaped confession during cross-examination.[5] The prosecutor also introduced a letter that Brisbon had written to Wonson from the jail,[6] in which he promised to "take the dive on this shit by myself" and that he would tell the jury "some sucker shit like the police" were coercing him to confess.[7]

---

4. This confession matches the other witnesses' testimony, except that Ms. Route testified that she drove a Honda, not a Toyota, and that Brisbon torched the Ford F–150 truck himself.

5. We describe the videotape in greater detail *infra*.

6. Wonson was not detained pretrial.

7. Brisbon acknowledged that he wrote the letter and read it out loud at trial:

> Man I'm going to go ahead and take the dive on this shit by myself. I know that you're fucked up with me but I don't want or need Essay [Dana Route] getting locked up and them taking my peoples to the shit. And from what my lawyer tells me ain't really too much shit I can do or say in my defense because I told her . . . at the motion hearing neither one of us was going to get on the stand. And therefore that was going to lead grounds of us getting a severance trial, a severance trial.
>
> So once that happens they are going to try me first and that's when, that's when I was going to say fuck it, it was me all along. First, I was going to go with the fact that the statement was now under oath or my lawyer said that that shit don't mean nothing at all and I was going to go with the constitutional right I had to protect and that's life, liberty and property. And tell them peoples a[t] my trial that's why I made the tape.
>
> And tell them some sucker shit like police had made me a hard, made me a hostage situation but I still ain't tell my lawyer about that part yet.
>
> But she told me that after they fry me they was going to cut you lose so that's what I'm, that's what I'm planning on doing on the 30th of July. Just do me a favor and look out for Roniece for me Homes whenever you can, let me know something.

On cross-examination, Brisbon admitted that immediately after the videotaped confession he had also met with another detective and FBI agent concerning their investigation of another crime. During that interview Brisbon confessed to "half a dozen" unrelated crimes, and also gave information about other crimes in which he was not involved. Brisbon dismissed these volunteered confessions as a way to slander "people I didn't like," while offering information to the police in the hope that would help exonerate his mother, grandmother and Dana Route. Brisbon also admitted to having had a third meeting that night, with a different detective, and said the information he gave then also was false.

Finally, the prosecutor asked Brisbon about statements he had made at a "debriefing" meeting that Brisbon's counsel had requested two weeks before trial.[8] Brisbon admitted that at that meeting, with counsel by his side, he repeated what he had said in the videotaped confession, including details about Wonson having approached him because he had a "problem" and he knew Brisbon had a gun. Wonson was seeking to retaliate for a fistfight he had at a club. According to Brisbon, someone from the 17th & Compton/Independence neighborhood had punched Wonson at the Heart & Soul Nightclub, and, in retaliation, they had planned and executed the shooting at Eastern High School to kill anyone from that neighborhood. Brisbon testified that he had lied to the prosecutors again and that he had simply repeated what Detective Irving had previously told him to say on the videotape.

On February 13, 2002, the jury convicted each appellant of two counts of first-degree (premeditated) murder while armed of Charles Jackson and Ivory Harrison, *see* D.C.Code §§ 22–2401, –404.1(b)(6), –3202 (Supp.1999) (current version at D.C.Code §§ 22–2101, –104.1(b)(6),–4502 (Supp.2008)); one count of assault with intent to kill, while armed, Nikita Sweeney, *see* D.C.Code § 22–501 (Supp.1999) (current version at D.C.Code § 22–401 (2001)); *id.* § 22–3202 (current version at D.C.Code § 22–4502 (Supp. 2008)); three counts of possession of a firearm during a crime of violence, for two AK–47s and one Mac–90, *see* D.C.Code § 22–3204(b) (Supp.1999) (current version at D.C.Code § 22–4504 (2001)); and one count of felony destruction of property, for bullet holes to Nikita Sweeney's automobile, *see* D.C.Code § 22–403 (current version at D.C.Code § 22–303 (2001)).

## II.

### Voluntariness of Brisbon's Confession

Brisbon moved to suppress the admission of his confession into evidence, claiming that it was an involuntary statement elicited in violation of the Fifth Amendment. Before trial, Brisbon filed a motion to suppress his confession and witness identifications. The judge called for a hearing, but Brisbon's counsel presented no evidence relevant to the confession, choosing instead to argue only the suppression of witness identifications.

At trial, after Detective Credle testified about the police interrogation and Brisbon's confession, Brisbon renewed the motion to suppress his confession. The court denied the motion:

Brisbon explained that he had offered to take all responsibility because he knew Wonson "was mad because [Brisbon] put him in something he had no business, he wasn't never involved in." Similarly, Dana Route had had "no involvement." Although the detectives had suggested that he should incriminate both Wonson and Route, Brisbon said he implicated Wonson, but he refused to do so as to Route.

8. Presumably, the purpose of the meeting was to discuss a possible plea bargain.

I have heard absolutely nothing that would show that it was not voluntary. The fact that they used trickery has been well recognized in the case law as appropriate [ ]or at least admissible, and everything else, at this point at least, does not support the notion that it was involuntary, and that there wasn't any undue delay from the time he came in from P.G. County. It was within hours after that. Court was closed already. I haven't heard anything thus far that would render the statement [in]voluntary. Certainly what is played on the tape does not reflect an involuntary statement.

. . . .

[Counsel:] Your Honor, to complete the record, I would only state that we submit that the strong coercion and the involuntariness of the statement is supported strongly by the fact that the trickery was not against Mr. Brisbon himself, but was against the well-being of his grandmother and his mother.

■ Brisbon then took the stand and testified about how he felt pressured to confess when the police had lied to him about the fate of his mother and grandmother.[9] In response to the government's request that the judge "make some ... findings"[10] on the question of voluntariness, the trial judge stated that "even taking into account Mr. Brisbon's testimony, I would find that [the confessed] statements were wholly voluntary."[11]

■ Once a motion has been made to suppress a confession as involuntary,

> [t]he burden is on the government to prove that the statements of the accused were voluntarily given without police coercion.... Generally, the factors for consideration in determining voluntariness include [ (1) ] the circumstances surrounding the questioning, [ (2) ] the accused's age, education, and prior experiences with the law, [ (3) ] his physical and mental condition at the time the statement was made, [ (4) ] other factors showing coercion or trickery, and [ (5) ] the delay between the suspect's arrest and the confession.

*Davis v. United States,* 724 A.2d 1163, 1167–68 (D.C.1998) (citations omitted). The government must prove voluntariness "by a preponderance of the evidence."

---

9. Brisbon testified in response to examination by defense counsel:
Q You know at that point who has the power and who does not, correct?
A Correct.
Q In fact, even in their conversations they make that very clear to you that they have the power and you don't, correct?
A Correct.
Q But they give you a little bit of leeway letting you think that they are going to give you some power, correct?
A Correct.
Q That if you tell them what they want to hear, we're going to give you a little power?
A Right.
Q We are going to release, release your mother from jail, correct?
A And my grandmother.
Q And your grandmother? Your grandmother, how old—I'm sorry—how old was your grandmother at the time?
A Eighty-two or 83, I can't recall.
Q So in your mind you saw your 82 year old grandmother locked up?
A Right.
Q And your mother?
A Right.

10. The prosecutor said he was "not sure as to the findings to the voluntariness of Mr. Brisbon's statement."

11. As the trial judge twice ruled on Brisbon's pretrial motion to suppress the confession during trial, we reject the government's argument that the issue has not been preserved for appeal because defense counsel did not press for a ruling pretrial. *See* Super. Ct.Crim. R. 12(b)(3) (requiring that motions to suppress "must be raised prior to trial").

*Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). We review the trial court's findings of the historical facts that occurred during interrogation under a clearly erroneous standard. *See Morris v. United States,* 728 A.2d 1210, 1215 (D.C.1999); *Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991) (en banc). The ultimate question of whether the confession was voluntary for Fifth Amendment purposes, however, is a legal question we review *de novo,* viewing the totality of the circumstances. *See Davis,* 724 A.2d at 1168.

■■■■ Appellant's argument focuses on delay and the officers' use of deception. With respect to delay, the record shows that by the time appellant signed the *Miranda* waiver card, he had been in custody for approximately seven hours. Any delay of more than three hours is closely scrutinized, *see* D.C.Code § 5–115.01 (2001), but this by no means leads to an automatic finding of involuntariness if the circumstances, taken as a whole, support that the confession was voluntary. *See Bond v. United States,* 614 A.2d 892, 899–900 (D.C. 1992). Here, the police do not appear to have delayed in giving *Miranda* warnings for any coercive effect; rather, the delay was mostly the result of Brisbon having been arrested outside the District. Once they arrived at the D.C. police station and booking was completed, the detectives informed Brisbon of the charges against him and gave him *Miranda* warnings before beginning to interrogate him. Moreover, there was no evidence that the number of hours or conditions in custody, or the length of the questioning itself, were unreasonable or had a coercive effect on Brisbon.[12]

We are more troubled by the deception used by the police officers and its coercive potential. The injunction against the admission of involuntary confessions is grounded in two separate clauses of the Fifth Amendment. *See Dickerson v. United States,* 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The first is the privilege against self-incrimination, *see* U.S. CONST. amend. V ("nor shall [any person] be compelled in any criminal case to be a witness against himself"); *Oregon v. Elstad,* 470 U.S. 298, 306–07, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (noting that the use of compelled testimony is prohibited in the government's case-in-chief). The second is the Due Process Clause. *See Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) ("Indeed, even after holding that the Fifth Amendment privilege against compulsory self-incrimination applies in the context of custodial interrogations ... the Court has continued to measure confessions against the requirements of due process." (citations omitted)). In early Supreme Court jurisprudence, involuntary confessions were held inadmissible, stressing their inherent untrustworthiness.[13] *See Chambers v. Florida,* 309 U.S. 227, 240, 60 S.Ct.

**12.** According to Brisbon, he was in custody for "eight to nine hours" before the interrogation, which lasted "four or five hours." The police officers' testimony corroborates that Brisbon was in custody for approximately eight hours from the time he was arrested in Prince George's County to the time he was interrogated in the District. The officers testified that Brisbon confessed within approximately fifteen minutes (after having been told the lies about his mother and grandmother) and gave the videotaped confession two hours later. The officers' testimony is confirmed by the transcript of the videotaped confession, which states that the recording began at 9:30 p.m. The trial judge did not make any specific fact findings reconciling these different time lines, nor was he asked to do so. In any event, we do not think that the voluntariness of Brisbon's confession would turn on this relatively slight discrepancy.

**13.** In this case, the record corroborates that Brisbon's confession was truthful because it both contained details that only a participant

472, 84 L.Ed. 716 (1940) (noting that the suspect's first confession, which was rejected "because it was found wanting," resulted in continued questioning until the suspect made statements acceptable to the state's attorney); *Brown v. Mississippi,* 297 U.S. 278, 282, 56 S.Ct. 461, 80 L.Ed. 682 (1936) (reversing conviction based on confession deemed unreliable where defendants were beaten by officers and were told that the "whipping would continue unless and until they confessed, and not only confessed, but confessed in every matter of detail as demanded by those present"). In *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), the Court explained that the reliability of a confession—although obviously important to the truth-seeking purpose of a criminal trial—is not the touchstone of the inquiry:

> Our decisions ... have made clear that convictions following the admission into evidence of confessions which are involuntary, *i.e.,* the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.

*Id.* at 540–41, 81 S.Ct. 735 (citing cases). *See United States ex rel Chabonian v. Liek,* 366 F.Supp. 72, 76–77 (D.Wis.1973) ("The focus of the Court has thus been broadened from protecting the innocent from the possibility of a false confession to protecting the guilty from unfair methods of procuring statements from them.").

■ The judicial inquiry into voluntariness, based on due process concerns, has been described as a hybrid "amphibian," *Culombe v. Connecticut,* 367 U.S. 568, 605, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), because it subsumes a "complex of values," *Blackburn v. Alabama,* 361 U.S. 199, 207, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). As the Court has explained,

> The locus of the right [in the Due Process Clause] is significant because it reflects the Court's consistently held view that the admissibility of a confession turns as much on whether the techniques for extracting the statement, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne.

*Miller,* 474 U.S. at 116, 106 S.Ct. 445 (citing *Gallegos v. Colorado,* 370 U.S. 49, 51, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962)); *Culombe,* 367 U.S. at 605, 81 S.Ct. 1860). And the Court has observed that "[t]he privilege against self-incrimination enjoined by the Fifth Amendment is not designed to enhance the reliability of the factfinding determination; it stands in the Constitution for entirely independent reasons." *Allen v. Illinois,* 478 U.S. 364, 375, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) (citing *Rogers,* 365 U.S. at 540–41, 81 S.Ct. 735) (distinguishing reliability concerns in noncriminal cases).

Although the Court has recognized that the "voluntariness rubric has been variously condemned as 'useless' ... 'perplexing' ... and 'legal double talk,'" *Miller,* 474 U.S. at 116 n. 4, 106 S.Ct. 445,[14] in *Dicker-*

---

would be reasonably expected to know and matched up with the eyewitness evidence presented at trial. At the time Brisbon confess-

ed, for example, the detectives were unaware there had been a second shooter.

**14.** Legal scholars have criticized the "over-

*son* the Court confirmed that it has "never abandoned this due process jurisprudence" and its focus on "an inquiry that examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession," 530 U.S. at 434, 120 S.Ct. 2326 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). To implement these principles, and recognizing the inherent difficulty in ascertaining whether a suspect has been coerced into confessing, we have said that "[c]onfessions generally are not vitiated when they are obtained by deception or trickery, as long as the means employed are not *calculated* to produce an untrue statement." *In re D.A.S.*, 391 A.2d 255, 258 (D.C.1978) (emphasis added). This short-form guideline reflects the dual due process concerns that a confession may not be obtained by means that are offensive to due process (inquisitorial methods that overbear the suspect's will) and that such undue coercion is likely to lead to a false confession. *See Rogers*, 365 U.S. at 541, 81 S.Ct. 735 (noting that "confessions cruelly extorted may be and have been, to an unascertained extent, found to be untrustworthy"). Thus, we have affirmed a conviction based on a confession obtained after the police used a technique where the police ran a fake lie-detector test on the defendant. *Contee v. United States*, 667 A.2d 103, 104 (D.C.1995). As we explained, the suspect in a *Contee*-type situation retains ultimate control over his statements because he privately knows whether they are in fact lies. Similarly, in

*Davis*, we concluded that the trickery (falsely telling the suspect that his co-perpetrator had said that Davis was carrying a particular weapon) did not require suppression of a confession in part "because it was inconsistent with Davis's own first-hand knowledge," and, therefore, as the defendant himself testified, he was not fooled. *Davis*, 724 A.2d at 1168.

■ Here, on the other hand, Brisbon was subjected to a very different kind of psychological pressure, unrelated to the evidence the police purport to have that a suspect is guilty of the charged crime. After being told by the officers that his mother and grandmother had been arrested [15] as a result of the discovery of drugs and a shotgun during a search of their house, Brisbon testified, he felt coerced to tell the police "what they want[ed] to hear," so that his mother and grandmother would be released. The truth of the premise underlying the officers' deception—the existence of contraband of which Brisbon would have known—gave force to the officers' deception. We have not previously been presented with the question whether the technique used here—which could be taken by a suspect in custody as an implicit threat or a promise involving family members—was calculated to exert so much pressure on a suspect as to lead to a confession, whether true or false. Unlike the suspects in *Contee* and *Davis*, where the "the only adverse consequences of [not giving a confession] . . . were the results of ultimately being convicted of the crime,"

bearing of the free will" formula because it requires "the near impossible[:] . . . reliable access to or a reasonable approximation of the motivation of the individual who makes a statement." Ronald J. Allen, *Miranda's Hollow Core*, 100 NW. U.L.Rev. 71, 75 (2006); *see Welsh S. White, What is an Involuntary Confession Now?* 50 Rutgers L.Rev. 2001, 2003 (1998) ("As [Professor Yale] Kamisar pointed out, however, these tests were not only uninformative but ultimately misleading, as they

did not identify the full range of concerns considered by the Court in deciding whether a confession was involuntary." (footnote omitted.))

15. While, according to the police, the detectives told Brisbon that his mother was arrested and his grandmother was taken to the hospital, Brisbon testified that he was told that his grandmother also was arrested and had to be taken to the hospital.

*Ledbetter v. Edwards,* 35 F.3d 1062, 1070 (6th Cir.1994), Brisbon was confronted with a lie unrelated to the government's evidence of his guilt, that had consequences to others, not solely to his own fate. *See Holland v. McGinnis,* 963 F.2d 1044, 1052 (7th Cir.1992) (noting that the police tactic used in *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), where the suspect was threatened with loss of her children and federal benefits "also distorted the suspect's rational choice (*i.e.,* is it wise or morally right to confess given the aforementioned beliefs and judgments [concerning her own guilt and the government's evidence]?) by introducing a completely extrinsic consideration: an empty but plausible threat to take away something to which she and her children would otherwise be entitled"). As observed in *Ledbetter,* "[a] defendant who is completely innocent might well confess in the [latter] circumstances ... for fear of the extraneous adverse consequences[; b]y contrast, an innocent defendant in the [former] circumstances ... would have little incentive to render a false confession." 35 F.3d at 1070. This is at least in part because a suspect who is "in the dark" about what he is told is more susceptible to the coercive pressure of trickery, as he is dependent on what the police tell him, than one who can, as in *Contee* and *Davis,* use his own resources to test what he knows against what the police tell him, which would help him withstand the psychological manipulation. Extrinsic pressure "not only impair[s] free choice, but also cast[s] doubt upon the reliability of the resulting confession...." *Holland,* 963 F.2d at 1052.

▮ The detectives in this case candidly testified that they lied to Brisbon in order to get him "to admit his involvement in the case" and to "lure the truth" from him. When the officers who question a suspect by using trickery demonstrate an "undeviating intent ... to extract a confession ... the confession obtained must be examined with the most careful scrutiny...." *Spano v. New York,* 360 U.S. 315, 324, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); *see Beasley v. United States,* 512 A.2d 1007, 1015 (D.C.1986) ("The use of deception or trickery by police during an interrogation, *while subject to close scrutiny,* does not in and of itself render an otherwise voluntary confession invalid." (emphasis added)). We apply that close scrutiny here.[16]

We begin by cautioning that the kind of deception employed here, involving supposed harm to vulnerable family members, could well cross the line beyond the type of tactics *vel non* that a court will tolerate because they "are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause...." *Miller,* 474 U.S. at 109, 106 S.Ct. 445; *see also Colorado v. Connelly,* 479 U.S. 157, 163 n. 1, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (outlining examples of forms of psychological and physical pressures that have been deemed coercive); *Brown,* 297 U.S. at 286, 56 S.Ct. 461 (conviction reversed because confessions were obtained by torture "revolting to the sense of justice"). This is especially true if such tactics are used on a suspect particularly susceptible to police pressure. *See Spano,* 360 U.S. at 321, 79 S.Ct. 1202 (noting that due to increased use of more "sophisticat-

---

**16.** The officers testified that they thought the tactic they used was "legal," and said that they had used it in other cases and would do so again. Citing to three cases where this court considered the voluntariness of confessions given after officers overstated the evidence against the suspect, *see Davis,* 724 A.2d at 1167–68; *Contee,* 667 A.2d at 104; *In re D.A.S.,* 391 A.2d at 258, the government also failed to distinguish in its brief to this court the different deceptive tactic used here—implicit promises or threats involving family members.

ed" psychological persuasion, "more difficult ... delicate judgments" must be made, taking into account mental state of the suspect). We have already expressed doubt about the police's use of deceptive tactics to "persuade" a suspect that a confession is in his best interest, in light of the evidence already amassed by the government when, in fact, there is no such evidence. *See Beasley,* 512 A.2d at 1016 ("[W]e do not condone certain of the tactics used by the police in this case [promise of leniency and deception concerning strength of the government's evidence], and such tactics have made this a close case"). But the use of deception to exert psychological pressure that exploits vulnerabilities extraneous to the offense charged, such as the threat of adverse consequences to family members if the suspect does not confess or cooperate with the investigation, is in a different category that has been singled out for condemnation. *See Lynumn,* 372 U.S. at 534, 83 S.Ct. 917 (confession involuntary where suspect, who had been "set up" by informant and had no prior experience with criminal law, was threatened with loss of children and federal aid if she did not "cooperate"); *Rogers,* 365 U.S. at 549, 81 S.Ct. 735 (expressing view that "issue of voluntariness might fairly have gone either way in the whole of the testimony" where detained suspect who initially denied involvement in shooting confessed after being told that his wife would be brought into custody for questioning); *Spano,* 360 U.S. at 324, 79 S.Ct. 1202 (confession involuntary where the police used the suspect's "childhood friend," who falsely stated that the suspect's "telephone call [to him] had gotten him into trouble, that his job was in jeopardy, and that loss of his job would be disastrous to his three children, his wife and his unborn child"); *cf. Davis,* 724 A.2d at 1168 (finding confession voluntary when "[s]pecifically, [the police] made no threats or promises"); *Contee,* 667 A.2d at 104 (finding confession voluntary although appellant asserted that the police "used promises and implied threat," when "he generally does not articulate what those promises were ... nor does the record support his bare assertions"); *Ledbetter,* 35 F.3d at 1069 (suspect who was not physically punished or threatened and who waived *Miranda* rights three times not coerced into confessing even though officers lied about evidence incriminating him).[17]

Here, the trial court denied Brisbon's motion to suppress without taking note of the questionable mode of psychological pressure employed in this case,[18] and found that his statements were "wholly voluntary," without detailing the factors that led to that determination. We know from the record that the court had just heard the testimony of the officers, who admitted that they lied to Brisbon about his mother's arrest and grandmother's hospitalization in order to get him to confess, but said that they did not promise Brisbon that his confession would result in the exoneration of his mother or Brisbon's ability to see his grandmother. Brisbon, on the other hand, testified that he felt pressured to confess by the officers' decep-

---

**17.** Some courts draw a distinction between deceptive and truthful pressure tactics involving family members. *See United States v. Johnson,* 351 F.3d 254, 260–63 (6th Cir.2003) (finding that a promise of leniency to not charge the defendant's sister with a crime was not coercive because (1) it was not an illusory promise and the promise was kept, and (2) the threat to arrest the sister was supported by probable cause); *Armstead v. Mississippi,* 978 So.2d 642, 648 (Miss.2008) (finding that "[t]hreats to arrest a defendant's family member(s) do not render a confession involuntary so long as probable cause exists to arrest such persons").

**18.** As noted earlier, defense counsel highlighted this aspect of the officers' tactics.

tion which included that even his frail elderly grandmother had not only been hospitalized, but also arrested along with his mother. See note 9, *supra.* The effect that the officers' tactics reasonably had on Brisbon is a critical element of the voluntariness inquiry. The officers' description of Brisbon's reaction to their fabrication about his grandmother's and mother's plight (Brisbon dropped his head, was quiet, and said that he "did it," because he did not want to get others in trouble) does not necessarily describe a person forced by circumstances to confess, but it clearly shows that Brisbon was emotionally impacted by the lies the officers had told him. *Cf. Ledbetter,* 35 F.3d at 1066 (noting that suspect "broke down in tears and started crying, said he was sorry for the way it happened...."). The trial judge's determination, made after hearing the testimony of Brisbon and the officers and seeing the videotape of the confession, where Brisbon denied any coercion,[19] apparently was that the officers' calculated play on his emotional attachment to his mother and grandmother did not equate to unconstitutional coercion. It is of course possible that the unwelcome "news" about his mother's arrest and grandmother's hospitalization, rather than being something that overcame his will and coerced him to confess, could have instead shocked Brisbon into taking responsibility for his actions. *See Agnew v. United States,* 813 A.2d 192, 195 (D.C.2002) (suspect told the police that he "wanted to come clean"). In other words, the *truthful* information Bris-

bon had received about the seizure of drugs and a shotgun from their house might have induced him to want to spare them the "trouble" of being linked to his criminal activities. Brisbon testified that his mother had been arrested the year before on his account; and his mother confirmed in her testimony that she had been arrested, jailed and released, after which Brisbon became very protective of her and his ill grandmother.[20] This previous experience—and whether the officers who interrogated him were aware of it—would be relevant both to an evaluation of the officers' tactics and Brisbon's foreseeable reaction to the officers' deception involving yet another arrest of his mother for which he was to blame. The issue, however, was not explored on the record. Moreover, the officers' exchange with Brisbon about his mother and grandmother preceded the videotaped confession, so the trial judge was not able to evaluate from the tape itself Brisbon's reaction and his statements to the officers when he first confessed.

From our own review of the record, we note other factors that arguably would weigh in favor of a finding of voluntariness. *See Byrd v. United States,* 618 A.2d 596, 599 (D.C.1992) (in considering the voluntariness of a confession, appellate court conducts an independent review of the record to evaluate the totality of the circumstances). First, although this was the first time Brisbon had been charged and prosecuted, he had a previous arrest, a fact

---

**19.** According to the transcript of the confession, Brisbon denied being coerced by the police:
[Brisbon]: I have been treated fair, nice.
[Detective]: Has anyone promised you anything to give you this statement?
[Brisbon]: No, sir.
[Detective]: Has anyone forced you, coerced you, tricked you or did anything in order for you to give this statement?
[Brisbon]: No, sir.

....
[Detective]: ... you also agreed to talk [to] us ... at your free will [?]
[Brisbon]: Yes, sir.

**20.** Brisbon testified that he was very close to his mother and felt "disturbed" about her situation and that of his grandmother, who was then eighty-two years old and has Alzheimer's disease. Brisbon testified he would be "willing to sacrifice [his] life" for them.

indicating that he had some familiarity with the criminal justice system. *See Hawkins v. United States*, 304 A.2d 279, 281 (D.C.1973) (noting that courts examine "the individual's prior experiences, including those with the criminal justice system which tend to indicate an awareness of his rights ..."); *cf. Lynumn*, 372 U.S. at 534, 83 S.Ct. 917 (reversing conviction where suspect who confessed "had had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats"); *Spano*, 360 U.S. at 321–22, 79 S.Ct. 1202 (noting that suspect who confessed under pressure "was a foreign-born young man of 25 with no past history of law violation or of subjection to official interrogation...."). But we do not know anything else about the circumstances of Brisbon's prior arrest, or whether he was subject to interrogation at that time.[21] Second, "Brisbon twice waived his *Miranda* rights, including, specifically," "the right to remain silent," once at the beginning of the interrogation, and again at the start of the videotaped confession. *See Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) ("Before petitioner made any incriminating statements, he received partial warnings of his constitutional rights; this is of course, a circumstance quite relevant to a finding of voluntariness."); *United States v. Charlton*, 565 F.2d 86, 89 (6th Cir.1977) ("Obviously anyone who knows his rights and determines to confess does so for a reason." That the defendant's reason was to protect his son does not, in our judgment, "render his confession involuntary or necessitate a finding that he was coerced or that his will was overborne."). Third, there is no indication based on the record

that due to Brisbon's age (twenty-two), educational background, or physical or mental condition, he was particularly susceptible to psychological pressure, save for the obvious emotional "hot buttons"—his concern for his mother and grandmother—that the police sought to manipulate. *See Frazier*, 394 U.S. at 739, 89 S.Ct. 1420 ("[Petitioner] was a mature individual of normal intelligence"). Fourth, the letter Brisbon wrote to Wonson from jail showed the cunning disposition of a person able to withstand pressure and "game the system." In the letter Brisbon told Wonson that after having implicated Wonson in his confession, he would "take the dive on this shit by [him]self," in order to secure a severance, and then "flip the script" at trial by "tell[ing] [the court] some sucker shit like [the] police had made [him] a hard, ... hostage situation...." See note 7, *supra. See Gomez v. United States*, 597 A.2d 884, 892 (D.C.1991) (Where no coercive or deceptive tactics used, "[suspect's] explanation of his motive [in order to protect his innocent friend"] supports the view that "[suspect] understood that he did not have to confess but chose to do so for logical and well-thought out reason."). Finally, Brisbon confessed not only to the murder and assault of two innocent persons in a hail of bullets fired into a group at Eastern High, but also went on to confess to other, unrelated crimes—going well beyond what even he testified the officers told him they "wanted to hear." In light of these indications that Brisbon may well have been able to resist the officers' deceptive pressure tactics, we are inclined to conclude that Brisbon did not in fact succumb to them, and that his videotaped confession was therefore voluntary and admissible.[22]

---

**21.** This arrest appears to have been related to the same incident the previous year when his mother was arrested. Both, apparently, were released without charge; but, again, the record is not clear.

**22.** A number of the factors we have identified

We recognize that the question of voluntariness in this case is a close one, however, and do not decide it, because we can conclude beyond a reasonable doubt that even if the confession should have been suppressed, its admission was harmless. *See Arizona v. Fulminante,* 499 U.S. 279, 285, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (admission of involuntary confession is "trial error" subject to harmless error analysis); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("[B]efore a [constitutional] error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."). We recognize that a defendant's confession is uniquely powerful evidence and that its erroneous admission will be deemed harmless only rarely, by an overwhelming government case. *See Fulminante,* 499 U.S. at 312, 111 S.Ct. 1246 (Rehnquist, J., for plurality) (noting that "an involuntary confession may have a more dramatic effect on the course of a trial than do other trial errors ... [and] may be devastating to a defendant"); *id.* at 292, 111 S.Ct. 1246 (White, J., dissenting in part) ("A defendant's confession is probably the most probative and damaging evidence that can be admitted against him." (citation omitted) (internal quotation marks omitted)); *id.* at

313, 111 S.Ct. 1246 (Kennedy, J., concurring) (noting that "the court conducting a harmless-error inquiry must appreciate the indelible impact a full confession may have on the trier of fact"). For the following reasons, we think that even if we assume that Brisbon's confession was involuntary, and its admission unconstitutional, it was nevertheless "harmless beyond a reasonable doubt." *Chapman,* 386 U.S. at 24, 87 S.Ct. 824.

This is a case where the government's evidence was not merely sufficient, or even strong, but "presented 'overwhelming evidence' of guilt." *Fields v. United States,* 952 A.2d 859, 862 (D.C.2008) (quoting *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) (applying "overwhelming evidence" test where court erroneously admitted co-defendant's confession in violation of defendant's right to confrontation under the Sixth Amendment)); *cf. Fulminante,* 499 U.S. at 297, 111 S.Ct. 1246 (White, J., for plurality) (reversing conviction where "[a]bsent the confession[ ], it was unlikely that [the suspect] would have been prosecuted at all, because the physical evidence from the scene and other circumstantial evidence would have been insufficient to convict"). Apart from the challenged confession, the

raise questions of credibility and historical fact that normally would have been evaluated in the first instance by the trial judge. The fact that the trial court's rulings denying the motion to suppress were made during trial and not at a pretrial hearing probably accounts for the lack of a full evaluation of the type of coercive pressure used in Brisbon's interrogation and specific findings on the record in this case. Because on appeal this court is charged with conducting an independent plenary review of the record as a whole, a remand for further findings might be the most helpful course to permit a comprehensive evaluation of all the factors relevant to voluntariness. *See Miller,* 474 U.S. at 117–18, 106 S.Ct. 445 (noting responsibility of reviewing court to conduct an independent review of

the record after resolution by trial court of "subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings," and remanding to appellate court because "the case warrants fuller analysis under the appropriate standard"); *see also Castellon v. United States,* 864 A.2d 141, 158 (D.C.2004) (noting that failure to object to trial court's omission of essential fact-finding may result in waiver). We do not do so in this case, however, because for reasons we discuss in the text, we conclude that even if the confession should not have been admitted, it was harmless when viewed in the context of the government's overwhelming case.

evidence arrayed against Brisbon consisted of the testimony of several witnesses and other confessions the admissibility of which is not challenged. An eyewitness to the shooting, Jameice Phillips identified Brisbon, who she knew as "Ronnie T," as the shooter. She testified that she had known him through "friends and family," for five years. On cross-examination, she maintained that she was "sure that the person [she] knew as Ronnie T," was "the person who was shooting at the vehicle." Although Phillips was impeached with a relatively minor inconsistency in her testimony to the grand jury, she was not biased, unreliable, or unable or unwilling to identify the shooter. Nor was Brisbon's videotaped confession to the officers his only admission of guilt. Dana Route testified that Brisbon had also confessed to her, shortly after the shooting. Although Route herself had cause to be concerned that she might be implicated in the crime, and therefore could have been perceived as biased, she not only explained the reason for her late report to the police, but also gave credence to her account by admitting to her own participation in the events. Route testified that she accompanied Brisbon to buy the stolen truck, and saw appellants leave the house with two rifles, which Brisbon had just cleaned. She testified that when appellants came back, she heard Brisbon tell Wonson, "I can't believe your gun jammed" (which was corroborated by the unspent cartridge found at the scene), and she later drove with Brisbon to the place where he set fire to the truck. Michael Cobb corroborated Route's testimony by identifying Brisbon as the person to whom he sold the stolen truck used in the shooting, and identifying that truck as the one torched the day after the shooting. At trial, Brisbon admitted that two weeks before the trial, he had requested a meeting with the prosecutor. At that meeting, accompanied by his counsel, Brisbon confessed again to the motivation for preparation and execution of the shooting at Eastern High.[23] Finally, Brisbon's letter to Wonson from jail about the "sucker shit" he planned to present at trial to impeach his confession to the police could have been interpreted by the jury as a strongly implied admission of involvement in the shootings.

Even after Brisbon's videotaped confession to the officers was admitted, the issue of its voluntariness and credibility remained for the jury. The jurors were instructed to weigh the credibility of Brisbon's confession in light of his testimony that it had been coerced:

It is for you to decide whether a witness made a statement on an earlier occasion and whether it was, in fact, consistent with the witness' in-court testimony here.

Evidence has been introduced that Mr. Brisbon made statements to the police about the crime charged. You should weigh that evidence with caution and carefully consider all the circumstances surrounding the making of the statement. Do this in deciding whether the Defendant made the statement and what weight to give it along with all the other evidence when deciding the guilt or innocence of the Defendant.

23. Brisbon had entered into a "debriefing agreement" which provided that his statements could be used for purposes of impeachments. Without such waiver, Brisbon's statements in plea discussions would be inadmissible. See D.C.Crim. Pro. R. 11(e)(6); Price v. United States, 697 A.2d 808, 815 (D.C.1997). Brisbon does not argue that he would not have taken the stand—which opened the door to the prosecutor's impeachment with his statements during the debriefing session—but for the erroneous admission of the videotaped confession. Nor did Brisbon request an instruction limiting the jury's consideration of his debriefing statements to impeachment of his trial testimony.

If you decide that the Defendant did make the statement, in examining the circumstances surrounding the statement, you may consider whether the Defendant made it freely and voluntarily, with an understanding of what he was saying.

You may consider whether he made it without fear, threats, coercion or force, either physical or psychological, and without promise of reward.

You may consider the conversations, if any, between the police and the Defendant. For example, you may consider whether the police warned him of his rights, where and when the statement was given, the length of time, if any, that the police questioned him, who was present, the physical and mental condition of the Defendant.

You may consider the age, disposition, education, experience, character and intelligence of the Defendant.

Considering all the circumstances, you should give his statement such weight as you think it deserves.

*See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.48 (2008).

At closing Brisbon's trial counsel focused the jury's attention on the question of coercion:

> Ladies and gentlemen, I told you at the beginning that this case would come down to whether or not you could believe that police officers would force a confession from an innocent person. Ladies and gentlemen, that's what the case was from the beginning, and that's what the case is about now.
>
> . . . .
>
> I submit to you ladies and gentlemen, that there is no question that Mr. Brisbon's response was a response given trying to help his family, and he would have done anything to try to help his family.

> Just like the officers indicated they would lie or do whatever was necessary to get this case resolved. . . . Mr. Brisbon would do whatever was necessary to assist his grandmother and his mother under these circumstances.
>
> . . . .
>
> You have to consider that he was lying for reasons which he considered to be valid, protecting his family, protecting his circumstances, his mother's and his grandmother's, and ladies and gentlemen, although he must—he made a very, very bad choice, it doesn't make him a killer.

Here, the jurors were urged to assess for themselves whether Brisbon was forced to say something untrue. Brisbon's trial counsel apprised the jury of the conditions under which Brisbon gave the confession, and the trial court properly instructed that the jurors were the final arbiters of its trustworthiness. Although the erroneous admission of an involuntary confession cannot be "cured" by presenting the physical and psychological conditions under which the confession was elicited, the Court has recognized the critical role of the jury in evaluating evidence so highly relevant to its consideration of the guilt or innocence of the defendant, because

> . . . confessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be "insufficiently corroborated or otherwise . . . unworthy of belief."

*Crane v. Kentucky,* 476 U.S. 683, 689, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting *Lego,* 404 U.S. at 485–86, 92 S.Ct. 619). Whatever doubts the jury could have entertained about Brisbon's videotaped confession—or any taint from its erroneous admission—would have been outweighed

by Brisbon's subsequent and independent confessions to Route and to the prosecutor that were removed in time and circumstance from the videotaped confession. *Cf. Fulminante,* 499 U.S. at 299, 111 S.Ct. 1246 (White, J., dissenting in part) (recognizing that "in some cases two confessions, delivered on different occasions to different listeners, might be viewed as being independent of each other").

On this record, where the jurors were pointedly directed to Brisbon's videotaped confession and the serious questions it raised for their consideration, we have no cause to second-guess a verdict that is otherwise supported by overwhelming independent evidence of Brisbon's guilt. *See Sims v. Brown,* 425 F.3d 560, 571 (9th Cir.2005) (assuming that statement "I had to kill that boy" was involuntary and should not have been admitted, but affirming conviction where evidence of guilt was "overwhelming and there is no reasonable likelihood that the challenged statements actually prejudiced" defendant); *Berg v. Maschner,* 260 F.3d 869, 871 (8th Cir.2001) (assuming that confession was erroneously admitted and concluding that it was harmless "when there remains overwhelming independent evidence as to the defendant's guilt," consisting of eyewitness testimony and defendant's immediate arrest in possession of gun used in shooting) (citations omitted).

## III.

### Mid-trial Delay

Brisbon moved for mistrial after a mid-trial delay of four weeks caused by the illness of Brisbon's defense attorney, which the trial judge denied. "A mistrial is a severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *Peyton v. United States,* 709 A.2d 65, 69 (D.C.1998) (citation omitted). If "the right of the defendant[ ]

to a fair trial [can] be effectively secured by" less drastic measures, then mistrial is not appropriate. *Id.* Here, the trial judge suspended the trial, but kept in touch with both Brisbon's attorney and the jury, appointed interim counsel for Wonson, consulted with Wonson's attorney, and provided additional time for closing arguments so that each party could recap the facts. Finally, the judge instructed the jury to not consider the delay when deliberating on the case. In light of the fact that significant resources had already been expended (selecting a jury and five days of testimony in presenting the government and defense cases), the trial court's several precautionary measures, and absent any evidence that Brisbon was prejudiced as a result of the delay, we conclude that the trial judge did not abuse discretion in denying the motion for mistrial.

## IV.

### Other Crimes Evidence

Brisbon claims that the government was erroneously permitted to introduce evidence of other crimes during his cross-examination, without adhering to the strictures of *Drew v. United States,* 118 U.S.App. D.C. 11, 331 F.2d 85 (1964). "[C]ourts presume prejudice and exclude evidence of other crimes unless that evidence can be admitted for some substantial, legitimate purpose." *Coleman v. United States,* 779 A.2d 297, 301 (D.C. 2001) (citation omitted). *Drew* applies to the admission of other crimes as substantive evidence, but does not apply to the use of such evidence for impeachment purposes. *See Samuels v. United States,* 605 A.2d 596, 597 (D.C.1992). Here, the purpose of the cross-examination was impeachment, to highlight the conflict created by Brisbon's assertion at trial that "[e]very single word [he] said [to the police when he confessed] was false ... but [he was] telling this jury the truth," in an

effort to persuade the jury that Brisbon has little respect for the truth.

The prosecutor asked Brisbon whether he had told the detectives that he was involved in other unspecified crimes.[24] Brisbon's response was that although he had *claimed* to two different group of investigators (after he confessed to the murders for which he was charged in this case) to have participated in a number of other crimes "all of the information ... was false," and that he had made these false claims to get back at "people I didn't like," presumably by naming them as accomplices. "When a witness [ ] affirms the truth of a prior statement, the earlier statement is to be considered not only as bearing on the credibility of the witness but as affirmative evidence." *Watts v. United States,* 362 A.2d 706, 712 n. 11 (D.C.1976) (citation omitted) (internal quotation marks omitted). Here, Brisbon did not affirm the truth of the prior statements, and the supposed half-dozen other crimes were not admissible as substantive evidence. Although the trial judge offered to give a limiting instruction to that effect, none was given (or requested) immediately after. As we discuss in more detail, *infra,* the trial judge instructed the jury that it could also consider the statements as substantive evidence against Brisbon.

Importantly, the judge cautioned the prosecutor not to "get into the specific crimes," and that ruling was respected. No evidence other than Brisbon's vague claims was presented concerning these "other crimes." In closing, the government attacked Brisbon's credibility, but at no point did he argue that Brisbon had committed any crime other than the ones for which he was charged in this case. As the purpose of the questioning was to impeach Brisbon's credibility, there was no reversible error.

## V.

### Severance

Michael Wonson moved for severance before trial specifically citing Sixth Amendment *Bruton* problems. *See Bruton v. United States,* 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).[25] The trial judge denied the motion without prejudice after excising references to Wonson from Brisbon's confession, consistent with our instruction in *Smith v. United States,* 312 A.2d 781 (D.C.1973), that a trial judge should first attempt "delet[ing] from the statement all references to the nondeclarant codefendant. If this is not feasible then a severance under Super. Ct.Crim. R. 14 should be granted on motion, or with the consent of the nondeclarant defendant." *Id.* at 788 (citations omitted).

Brisbon eventually took the stand and was cross-examined by Wonson's attorney,

---

**24.** "[Is] it true that you told them about half a dozen crimes in which you had participated"?

**25.** Wonson requested severance at several other points during trial. Before Brisbon took the stand in his own defense, Wonson's counsel (Douglas Evans) also requested severance on the ground that if Wonson were tried separately, and Brisbon were tried first, Wonson could call Brisbon as an exculpatory witness. The trial judge denied the request, saying it was "speculative" at the time whether Brisbon would testify (and waive his Fifth Amendment privilege), and that it would not make sense to delay Wonson's trial until Brisbon was either acquitted or his appellate rights exhausted. Eventually, of course, Brisbon did take the stand, which led to the introduction of his unredacted confession incriminating Wonson, which we discuss in the text.

When trial was delayed due to the illness of Brisbon's attorney, discussed *supra,* Wonson also renewed the request for severance claiming he was prejudiced because of the potential loss of defense witnesses. On appeal, Wonson does not press either argument as a reason for reversal.

eliminating the grounds for Wonson's Sixth Amendment complaint. "[W]here a co-defendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the defendant, and proceeds to testify favorably to the defendant concerning the underlying facts, the defendant has been denied no rights protected by the Sixth and Fourteenth Amendments." *Nelson v. O'Neil*, 402 U.S. 622, 629, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971).

■■■■ We still guard against prejudice, however, even in " 'non-*Bruton*' situations—where the declarant codefendant takes the stand [and] no Confrontation Clause problem is presented." *Carpenter v. United States*, 430 A.2d 496, 502 (D.C. 1981). As we have recently reiterated, where no issue of confrontation is presented, "*Carpenter* sets out what must be done in a jury trial when one defendant's extrajudicial statement inculpates a codefendant" and is not admissible against the latter under a hearsay exception: [26]

> *Carpenter* holds that unless the government agrees to "forego any use of the statement," it must be redacted to eliminate all incriminating references to the co-defendant, or the co-defendant's motion for severance must be granted—

"whether or not" the defendant who made the statement takes the stand and testifies. 430 A.2d at 504. *Carpenter* further holds that a limiting instruction directing the jury not to consider the extrajudicial statement against the co-defendant is almost never an acceptable alternative to redaction or severance, because "[c]onfessions and admissions that are 'powerfully incriminating' present an especially great risk that limiting instructions will not be followed at potentially great prejudice to the non-confessing codefendant." *Id.* at 503 (quoting *Bruton*, 391 U.S. at 135, 88 S.Ct. 1620).

*Geter v. United States*, 929 A.2d 428, 431 (D.C.2007) (footnotes omitted).[27]

■■ Here, the trial judge originally redacted Brisbon's confession in keeping with *Carpenter*. However, after Brisbon took the stand, related the confession including parts significantly inculpating Wonson, and repudiated the whole thing as a police fabrication, the prosecutor persuaded the judge to admit the full unredacted confession to enable the government to impeach Brisbon's disavowal of it. The trial court ruled that the statements were admissible against Brisbon, both as substantive evidence and as impeachment of his testimony at trial repu-

---

**26.** There was no hearsay exception that would have permitted admission of Brisbon's out-of-court statements as substantive evidence against Wonson. Brisbon's statements implicating Wonson could not be introduced against Wonson as an admission because they were not made by or attributable to him, *see Chaabi v. United States*, 544 A.2d 1247, 1248 (D.C.1988), nor were they admissible under the hearsay exception for statements against penal interest because they did not directly implicate the declarant, Brisbon. *See Laumer v. United States*, 409 A.2d 190, 199–200 (D.C. 1979) (en banc) (adopting the principles set forth in FEDERAL RULE OF EVIDENCE 804(b)(3)); *Williamson v. United States*, 512 U.S. 594, 600–01, 114 S.Ct. 2431, 129 L.Ed.2d 476

(1994) (holding that non-self inculpatory statements are not statements against penal interest under FED.R.EVID. 804(b)(3)).

**27.** Only "in a certain, limited class of cases," where "redaction is impracticable" and the references to the co-defendant "are not significantly incriminating," may it be "appropriate for the trial court, after weighing the alternatives, and recognizing the desirability of excluding inadmissible evidence, to admit the statement with limiting instructions."

*Geter*, 929 A.2d at 431–32 (quoting *Carpenter*, 430 A.2d at 505). As we discuss *infra*, Brisbon's confession "significantly incriminat[ed]," Wonson and the limiting instructions given here were problematical.

diating his confession.[28] Once Brisbon had chosen to testify, the judge concluded, "the whole statement becomes in play now," although not as "substantive" evidence of Wonson's guilt but rather—in the words of the instruction the judge gave—to "impeach [B]risbon's testimony that ... *Wonson was not involved*" (emphasis added). *Carpenter* prohibits any such indirect use of an unredacted confession against a codefendant. Wonson did not procure Brisbon's testimony, and the fact that Brisbon—in a joint trial Wonson had opposed—acknowledged his prior accusations against Wonson that he repudiated at trial did not allow use of the unredacted confession to impeach his denial that Wonson was the other shooter. If a limiting instruction "is almost never an acceptable alternative to redaction or severance," *Geter*, 929 A.2d at 431, the one given here compounded the risk of prejudice by the ambiguous message it conveyed.

"Evidence that is probative of [Wonson]'s guilt but technically admissible only against [Brisbon] also might present a risk of prejudice." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). In this case, the prejudicial evidence—admitted over the vigorous objection of Wonson's counsel[29]—consisted of significant portions of Brisbon's videotaped confession that directly identified Wonson as a principal in the murders along with Brisbon's in-court testimony admitting to having repeated similar statements incriminating Wonson during the debriefing session Brisbon had with the prosecutor shortly before trial.

Following the presentation of these statements to the jury, the trial court gave the following limiting instruction:[30]

Those statements may be considered by you both as substantive evidence against Mr. Brisbon and as how it reflects on his credibility in his testimony during this trial. As to Mr. Wonson, those statements are not evidence. They are not evidence against Mr. Wonson in his trial in this case. *You may, however, consider those statements as impeachment of Mr. Brisbon's testimony that Mr. Wonson was not involved. In other words, Mr. Brisbon's testimony in this trial is testimony in Mr. Wonson's trial.* His prior statements, however, are not evidence against Mr. Wonson. You may consider them in evaluating the truth or falsity of Mr. Brisbon's testimony here.

(emphasis added).

We recognize that the trial judge's effort to fashion an instruction that cautioned the jury against using Brisbon's confession against Wonson, while allowing its full force against Brisbon—as substantive evidence and as impeachment of his in-court testimony that Wonson was not involved in the murders—may have presented an insurmountable challenge. But the instruction, particularly the parts we have highlighted, likely confused the jury

---

**28.** This aspect of the trial court's ruling is not challenged on appeal, only its impact on Wonson as codefendant in a joint trial.

**29.** The following colloquy followed objection by Wonson's counsel:

The Court: [W]hy in the world would [the prosecutor] be excluded from impeaching [Brisbon] with what he said [in his confession]?

Mr. Evans: Against my client? ... I mean at this point this is no longer a separate trial.

This is supposed to be two trials within one....

The Court: And [Brisbon's] a witness.

Mr. Evans: But this overthrows to my client.

The Court: Absolutely. And you can cross-examine him. You're stuck.

**30.** The court asked all counsel to propose a limiting instruction, but only the prosecutor volunteered one. As noted, Wonson's counsel had already objected to introduction of the unredacted confession and statements.

and required more subtle a grasp of the law of evidence than we usually expect of lay jurors. As a result, we cannot confidently rely on the instruction as having communicated to the jury, as the trial judge intended, that it could not consider as substantive evidence of Wonson's guilt, Brisbon's confession that Wonson was his accomplice in the murders.

Nor can we say, viewing the evidence as a whole, that the admission of Brisbon's confession was harmless. In his confession Brisbon not only identified Wonson ("my man Pretty B") at the outset as the second shooter, but also describes in detail how they obtained the truck and drove around looking for "some dudes from the 1700 block ... of Independence and Kentucky Court's Crew." Brisbon explained that the reason they targeted the group congregated outside Eastern Senior High was because Wonson said, "that's one of the dudes that hit him at the club." Brisbon continued:

> [W]e pulled up, [Wonson] fired one round out the window and it dropped one of the dudes that were standing by the tree with the drink.
>
> And after [Wonson] fired that one shot we both jumped out. And I started shooting at the car. And Pretty B started shooting at the victims.
>
> One car was coming down the street and it tried to bust a U[turn]. So I hit that car.
>
> After that I seen B [Wonson] chasing people across the—I mean, up at—up towards, going towards Eastern [High School], heading the Capitol way.
>
> So we jumped back in the truck and we had pulled off. . . .

... We both had AK–47s.

Brisbon continues to add detail about his and Wonson's activities, making clear that it was Wonson who was motivated to retaliate for a prior fistfight at a club ("I was just there to back him up"), and that Wonson participated in getting the truck in preparation for the retaliation, had a gun that he had hidden available for the occasion ("I took him to get his AK out[of] the woods. . . . It's in the graveyard right up ... behind Benning Heights Apartments"), fired "about 30 or 40" shots at Eastern High, fled the shooting in the truck with Brisbon, and along with Brisbon disposed of their guns by throwing them into the river. Suffice it to say that there is so much description of Wonson's activities in Brisbon's confession that when it was initially redacted for admission to exclude any reference to Wonson (before Brisbon recanted the confession in court and the trial judge ruled it admissible in its entirely against Brisbon), almost half of the forty page confession had to be stricken. Similarly, Brisbon's statements during the debriefing session with the prosecutor emphasized Wonson's role as not only a participant, but as the instigator of the shootings in retaliation for a fight in which Wonson had been punched in the eye. Moreover, Brisbon's description of what Wonson was wearing [31] dovetailed nicely with one of the victim's description of the shooter (a black man dressed in all black, including a black baseball cap, who came out of the truck's passenger side) as well as his position in the passenger side of the truck.

Without Brisbon's confession, the government's evidence against Wonson was largely circumstantial:[32] the testimony of

---

**31.** According to Brisbon, "B [Wonson] had on the black T-shirt. He had another black T-shirt tied around his head and some blue jeans. And I don't know what type of shoes or boots he had on."

**32.** At oral argument, the court inquired whether any of Brisbon's statements would be considered substantive, nonhearsay evidence under D.C.Code § 14–102(b)(3). However, as the issue is a complex one and, importantly,

Dana Route and Michael Cobb, who saw him go with Brisbon to purchase the black pick-up truck used in the shooting; Route's testimony that she saw Wonson armed, along with Brisbon, immediately before and after the shooting and that Brisbon had told her later that Wonson was involved in the shooting; when Wonson was arrested, the police found that he had a bulletproof vest and seventeen cartridges of the same 7.62 mm. caliber as had been fired outside Eastern Senior High. But, unlike Brisbon, who was identified by one of the eyewitnesses who knew him, no one at the scene identified Wonson. Indeed, none of the three eyewitnesses said there were two shooters—only Brisbon said so explicitly. The expert testimony showed that two guns were used in the shootings, and from that expert testimony, a reasonable inference could be drawn that there must have been two persons involved.[33] Although that evidence, if presented at a separate trial, would have sufficed for conviction, it is not so strong that we could say that the jury was not swayed to convict Wonson by Brisbon's unredacted confession given the sheer amount of detail it provided not only about Wonson's involvement at every step—before, during and after the shooting—but

also about the fact that he had the motive for the retaliatory shooting. In closing, Wonson's counsel attempted to discredit Brisbon's confession as a lie and suggested that Brisbon had made up the role played by Wonson. In rebuttal, however, the prosecutor emphasized Brisbon's confession, selecting to read to the jury only a small passage, but one which directly incriminated Wonson:

> I, along with Mr. Pretty B, were in the 1800 block ... on East Capitol Street. I, along with Mr. Pretty B, were there and we fired, and the first person was the male who dropped to the ground.

On this record, we cannot with any confidence rely on whatever effect remained of the trial judge's complex limiting instruction to temper the jury's consideration of Brisbon's tell-all confession in assessing Wonson's guilt.[34]

Because the error in admitting Brisbon's full confession incriminating Wonson in a joint trial was not harmless, Wonson is therefore entitled to a new trial.

## VI.

### Prosecutor's Comments/Ineffective Assistance of Counsel

Both appellants[35] argue that the trial

---

was not addressed at all in the trial court or in the government's brief on appeal, we do not decide it.

33. The detective investigating the case testified that until Brisbon's confession that Wonson had also been involved in the shooting at Eastern High, he had thought (based on the eyewitness' statements) that there had been only one shooter. It was not until after Brisbon confessed that the firearms examination revealed there were two guns used in the shootings.

34. As with the previous instruction, the judge's final instruction confusingly told the jury:

> The Government has presented evidence in the form of testimony and videotape regarding statements made by Mr. Brisbon to the police and prosecuting authorities. Such statements are admissible against Mr. Brisbon as evidence, and also to impeach his testimony at trial.
> *As to Mr. Wonson, they are only admissible to impeach Mr. Brisbon's testimony that Mr. Wonson was not involved. Mr. Brisbon's statements to the police are not admissible as evidence against Mr. Wonson.*

(emphasis added.)

35. We note that even though Brisbon also raises this challenge, the prosecutor's comment, to which counsel objected, was directed to the opening statement made by Wonson's counsel.

court erred in failing to address the harm caused by the prosecution's closing argument:

> ... Judge Richter told you ... that opening statements are not evidence, they're only a prediction of what the lawyers expect the evidence to show. Talk is cheap, and I know as a lawyer that talk from the mouth of an attorney is even cheaper. So when you make an opening argument, it's a check, it's a promise, but it's got to be backed up by the evidence.
>
> Now, the judge also told you ... that the Government must give an opening argument because we have the burden of proof. The Defendants are not required, under the law, to make any opening statements because that is not our system of justice.
>
> So when they come up here and choose to make an opening statement, they're making you a promise as to what the evidence holds for you....
>
> Mr. Evans stood up here and made an opening statement, and he told you that the evidence would show that his client, Defendant Wonson, was not at the 1800 block of East Capitol Street when this happened. He said the evidence would show that he had dinner with a young lady and then they went to a motel. Have you heard any such evidence?

 "In evaluating appellant's claim of prosecutorial impropriety, this court must 'first determine whether the prosecutor's comments constituted misconduct,'" and if so, determine the effect of those comments. *Edwards v. United States,* 767 A.2d 241, 253 (D.C.2001) (citation omitted). The prosecutor's comments were proper and within the bounds defined in our existing case law. As a general matter, "the prosecutor [is] entitled to point out that the defense counsel did not live up to its promises" by citing examples of "defense counsel's failure to prove what he said the defense would prove in its opening statement." *Brewer v. United States,* 559 A.2d 317, 323 n. 11 (D.C.1989). Here, in his rather short opening statement, Wonson's attorney told the jury, "[T]hat evening my client was with his girlfriend, a young lady, out at a restaurant and then they went to a hotel and you will hear that testimony." Instead, for reasons he subsequently explained in a post-trial hearing, counsel decided not to call the girlfriend as a witness, and, in closing argument, reminded the jury that in a criminal trial the defendant "does not have the burden to do anything. So even when I said that, I didn't lock us into having to put on evidence at all."

The prosecutor's closing remarks did not have the "potential to leave the jury with the impression that the defendants, who had presented no defense witnesses, were expected to provide proof of innocence," akin to the prosecutor's remark we disapproved in *Porter* that "[e]very defendant is entitled to [ ] the strongest defense possible." *Porter v. United States,* 826 A.2d 398, 407–08 (D.C.2003). Here, the prosecutor mentioned that it was the government that had the burden of proof, not to imply that it was no longer obliged to meet that standard because counsel did not call the alibi witness, but as a means to point out the unfulfilled proffer in defense counsel's opening statement as puffery. As the comments were proper, they required no intervention from the trial court.[36]

---

**36.** In a related argument, Wonson appeals the denial of his claim that counsel was ineffective because he failed to present evidence of the alibi defense he promised during his opening statement. *See Edwards,* 767 A.2d at 247 (citing a range of federal cases finding failure to follow through on an opening statement as prejudicial). The trial court found that counsel's failure to follow through did not prejudice the defense "one iota ... given the way it was dealt [with]." In light of our reversal of Wonson's convictions and remand

Accordingly, we affirm Brisbon's convictions. We reverse Wonson's convictions and remand for a new trial.

*So ordered.*

for a new trial, we need not address the claim of ineffectiveness of counsel.