*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 10-CF-765 & 13-CO-481

JALONTE LITTLE, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior
Court of the District of Columbia
(CF3-22821-08)

(Hon. Ronna L. Beck, Trial Judge)

(Argued April 15, 2014                    Decided November 12, 2015)

*Debra L. Soltis*, with whom *Paul Y. Kiyonaga* was on the brief, for appellant.

*L. Jackson Thomas, II*, Assistant United States Attorney, with whom *Ronald Machen Jr.*, United States Attorney at the time the brief was filed, *Roy W. McLeese III*, Assistant United States Attorney at the time the brief was filed, and *Heather L. Carlton*, *Elizabeth Danello*, *Chrisellen R. Kolb*, *Jeffrey Pearlman*, *Thomas Rees*, and *Elizabeth Trosman*, Assistant United States Attorneys, were on the briefs, for appellee.

Before BLACKBURNE-RIGSBY and BECKWITH, *Associate Judges*, and BELSON, *Senior Judge*.

BECKWITH, *Associate Judge*:    For nearly two hours of stationhouse

questioning, in the face of false reports that several witnesses had identified him, a

false claim that his fingerprints were found in the vehicle, and persistent illusory promises of favorable treatment if he confessed, eighteen-year-old Jolonta[1] Little remained steadfast in his denials that he was involved in the carjacking of which he was later convicted in this case. Things began to change, however, when a detective goaded him about the prospect of being sexually assaulted when he arrived at the D.C. Jail if he did not confess and thus give police "an opportunity to help [him] instead of incarcerate [him]." As Mr. Little began to waver, the detectives then proposed the idea of meeting with a lawyer to work out a deal. Under intensifying pressure, and having heard the detective mention a lawyer, Mr. Little inquired, "So where my attorney at?" and stressed that he was "trying to have that meeting set up." There would be no such meeting with his lawyer unless Mr. Little put some "meat . . . on the table" and confessed, the officer said: "I got to have a reason for that to happen, and that reason is going to have to be you telling me what happened that day when that lady got robbed." At this point, in the face of a threat of being raped in jail, a confusing statement about when he could see a lawyer, and a statement that conditioned a meeting with a lawyer upon his

---

[1] Mr. Little's name is spelled "Jalonte" in court records and in the caption of this case. During questioning, Mr. Little spelled his first name "Jolonta," and because it appears as "Jolonta" throughout the transcript of the interrogation videotape, we will generally use that spelling in this opinion.

confessing to the carjacking in this case, Mr. Little's resolve collapsed and he confessed.

The firmness of Mr. Little's denials during disquieting tactics and the persistence of those denials as the pressure increased help persuade us that when he finally did speak in the immediate wake of the most coercive tactics mentioned above, his statements were not made "freely, voluntarily, and without compulsion or inducement of any sort." *Haynes v. Washington*, 373 U.S. 503, 513 (1963); *In re J.F.*, 987 A.2d 1168, 1177 (D.C. 2010). On this ground, we hold that Mr. Little's motion to suppress his confession should have been granted, and we reverse Mr. Little's convictions[2] and remand for a new trial.

**I.**

The charges against Jolonta Little stem from a September 19, 2008, incident in which a woman named Camilla Deline was standing near her Toyota Highlander outside her daughter's apartment on T Street N.W. when she was grabbed from behind and choked by one man while another man demanded her keys. Ms. Deline's daughter, Marisa Deline, arrived to find a young man in the driver's seat

---

[2] Mr. Little was convicted of carjacking, D.C. Code § 22-2803 (a) (2012 Repl.), robbery, D.C. Code § 22-2801 (2012 Repl.), and aggravated assault, D.C. Code § 22-404.1 (2012 Repl.).

of her mother's car, another young man running around to the passenger side of the car, and her mother lying unconscious in the street. When Marisa yelled, the two men fled on foot. After a cell phone found in the vehicle was traced to Jolonta Little, police arrested Mr. Little on a juvenile absconder warrant and brought him to a Metropolitan Police Department station for questioning eight days after the incident. The interrogation was videotaped, and Mr. Little confessed to the carjacking at issue in this case approximately two hours into the more than five-hour-long videotape.

## A. The Interrogation

As one detective put it, Jolonta Little's day began on September 27, 2008, when police "bang[ed] [his] door down at 7:00 in the morning and drag[ged] [him] out of bed while [he was] still in [his] drawers." By 8:37 a.m., Mr. Little, who had just turned eighteen the month before, was sitting alone in a small interrogation room, on a metal chair, with one wrist chained to the floor and both feet shackled, fidgeting and seeming to try to find a position in which he could sleep.

Several minutes into the videotape Detective Joe Crespo entered the room, followed some time later by Detective Dailey. Near the beginning of the

interrogation, Detective Crespo read Mr. Little his *Miranda*[3] rights. Before doing so, he told Mr. Little that this interrogation was "bigger than [the] absconder warrant" that he was picked up on, that "people are calling us telling us it was you" and "telling us what . . . you've done," that he had been identified as the perpetrator in some "robberies," and that Detective Crespo was "already straight on [his] case." "If we don't work it out," Detective Crespo said, "we're going to go through with what we're doing and you're going to get hit with every one we got . . . [u]nless you're able to offer some sort of explanation and alibi"—like explaining more about the money his mother gives him every month, as "not everybody has that, so that's a good thing for you." Mr. Little could refuse to answer any questions, the detective told him, "or you can say, you know, I want to talk to you because I want to find out more about what we know, you know what I mean? Because maybe we're wrong, who knows." But "this will be a unique opportunity for you to find out exactly what we got," and to "offer an explanation" or "offer . . . something" that would convince the detectives they are wrong.

Detective Crespo read Mr. Little his rights, then told him that "if you want to find out more about what we think we know, you're going to have to agree to answer questions." Mr. Little hesitated, then said he would agree "as long as you

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

all let me stop when I say I ain't ready—I don't want to talk," to which Detective Crespo responded:

> That's cool. We can't make you do nothing because believe me when I tell you, this is an opportunity for you. This is not just—if we went through what we got already, we would have got a warrant for you already, but I knew that there has to be some sort of explanation because we both have been doing this for a long time. There had to be an explanation for what's been going on, and we are offering you the opportunity to explain something because typically, nine times out of ten, we get the warrant and lock you up and that's it.

After Detective Crespo instructed him to sign the form waiving his rights— "and I need you to sign it right there. What position you play in football?"—Mr. Little signed the form and the two then discussed football. At other points throughout the interrogation, the detectives talked to Mr. Little about other topics besides the offenses they suspected him of committing, including his son, his girlfriend, his Muslim religion, his hope to get his GED, his mother—"[Y]our mom loves you to death . . . and now she doesn't have a son"—and the money his mother regularly gave him from a monthly check she received that somehow pertained to Mr. Little's learning disability. The detectives also inquired about Mr. Little's comfort, asking whether he had to use the bathroom and whether he was "all right," and offering to get him food from McDonald's.

Early on in the interrogation, the detectives sought to convince Mr. Little

that they already had enough evidence to prosecute him for the offense—that, in the words of Detective Crespo, "we got you by the balls," "the chances of you getting charged with robbery are very high," and "this case is easy, and there's a very good chance you're going to get convicted of this, okay?" One piece of this evidence was real—Mr. Little's cell phone, which was found in the complainant's vehicle after the incident at 9th and T Streets. When Detective Crespo showed Mr. Little the phone, Mr. Little said that it was his phone and that he had lost it before that robbery occurred. Most of the detective's "evidence" was feigned. The detectives told Mr. Little, for example, that his fingerprints were found at the scene and that several witnesses to the carjacking would testify that they had selected his photograph from an array of nine photographs, when in fact, the government presented no fingerprints at trial and no witness identified Mr. Little as one of the carjackers. Detective Crespo also told Mr. Little—falsely—that he was subject to an enhanced penalty for robbing a senior citizen.[4]

As Mr. Little continued to deny being involved in any robbery, the

---

[4] D.C. Code § 22-3601 (2012 Repl.) provides an enhanced penalty of up to one and a half times the maximum term of imprisonment for certain offenses when they are committed "against an individual who is 60 years of age or older." Camilla Deline testified that she was 58 years old at the time of the offense.

detectives tried persuading him that he was going to be convicted no matter what,[5] but if he cooperated by confessing, and by naming the other carjacker, he could get his charge reduced or dropped altogether. "You could be a defendant or a witness," Detective Crespo told him. "[T]hey're going to throw your life away unless you decide . . . to come clean with everything and talk with us about whatever is going on and whatever happened."

While Detective Crespo noted that it was "illegal" for a detective to promise that Mr. Little's charge would be dismissed, he said that he had been working with the U.S. Attorney's Office for eighteen years, that "they've grown to expect the kind of work that I do," and that if Mr. Little talked, "the U.S. Attorney's Office will be able to do something to hook you up." In that same vein, Detective Dailey stated, "I'm trying to be straight up with you so that you can try to save your life. I don't want to see a young man go to jail." When Mr. Little seemed doubtful, Detective Crespo asked, "Are you out of your mind?" and told Mr. Little about a man he arrested on his third gun charge in two years who was "walking the street" "[b]ecause he decided to tell us what happened." Detective Dailey added: "There's plenty of people walking the street today that have done more horrible

---

[5] "I know you did the robbery, okay? That's a given," Detective Crespo said. "I've never been involved in a case in 18 years where I was this lucky the way this case has worked out. You're going to get convicted on this."

things than you." As the detectives pressed the theme that "this is your opportunity," that "[t]his is where you help yourself," and that confessing was a way to avoid spending forty-five years in prison and coming out "a broke down old man" whom "no girl is going to want" "with a long criminal record trying to get a job," Mr. Little continued to deny having robbed anyone.

At various points throughout the interrogation the detectives offered Mr. Little excuses for his involvement in the carjacking. Referring to Mr. Little as a "good kid caught up in some bad shit," Detective Dailey said that "8th and R"— where Mr. Little said he hangs out—"is a rough place," and "whether or not it's just a matter of you caught up with the wrong crowd, who you were with, something happens, you know, you might just be there, you know." He continued: "I don't think you're a dangerous guy. I think you just got caught up in some shit . . . . We're trying to work with you and trying to help you, but you got to help yourself a little bit." Mr. Little continued to deny any involvement in the offense.

In addition to urging Mr. Little to help himself by confessing, the detectives also repeatedly characterized his confessing and cooperating as ways to avoid certain bad consequences. If he didn't cooperate, they said, they would show his photo to the victims of other robberies in the area of 9th and T: "Maybe you didn't do them, but what if they pick you?" Detective Dailey also said that "there's a

whole lot of robberies on Georgia Avenue" in which he could be a suspect, "including one that shot a police officer." The detectives referred repeatedly to "all these robberies" they could charge him with. But if he confessed: "I don't have to show your photo spread to 20 people that were robbed in that area." Otherwise, "guess what I'm doing for the rest of the day? Hey, this is Detective Crespo, I was wondering if you think—could you identify the person that robbed you? . . . Tell us about this and I won't have to do that."

The detectives also imparted another kind of warning. That is, if Mr. Little did not help himself and confess, he would go to jail—where "[t]here's a big difference between being an adult and being a juvenile"—and he would face the same risk of being sexually assaulted that another man he knew well—his godbrother, Wee Wee—had recently faced. "You know Wee Wee down at LeDroit Park? You know what happened to him when he got locked up?" Detective Crespo asked. "The day Wee Wee went to jail, you know he's an adult now. Somebody sexually assaulted him. That's not how you want to live your life. You ain't no Wee Wee." In a similar vein, the detectives also indicated that if he did not confess and cooperate, he would be convicted and possibly be incarcerated far away in a prison while his girlfriend would forget him and be "laid up in the bed spooning somebody else" and his son would never visit him: "Maybe you're going to another state"—"How often is Jaylen going to come see

you?"

The officers' final tack began when Detective Crespo stated that if Mr. Little confessed, he would arrange "to sit and meet with your attorney . . . before I get an arrest warrant for you." "So where my attorney at?" Mr. Little asked. "You pick one after you go to arraignment," Detective Crespo responded, continuing that he could "set up a meeting for you, your attorney, the prosecutor and us," but before he did so, "I got to have a reason for that to happen, and that reason is going to have to be you telling me what happened that day when that lady got robbed." Mr. Little said, "See, but I'm trying to have that meeting set up though," to which Detective Crespo responded that he promised to arrange the meeting, but "I need to have some meat to put on the table before I set up a meeting."[6] Shortly thereafter, Mr. Little asked, "But you ain't going to charge me as of right now? And you promise me that?" and Detective Crespo responded, "Yeah, I do promise you that." Two minutes later, Mr. Little confessed his involvement in the carjacking on T Street.

---

[6] This colloquy echoed an earlier comment Detective Crespo made to Mr. Little that "if you decide to cooperate, you're not going to get a 45-year sentence, and I'll tell you what, and I'll tell you what I can arrange. If you sit here and tell us who you were with and tell us about this other deal, I can arrange a meeting between us two, you, and your attorney, and the prosecutor, and we can work out a deal[.]"

**B. The Suppression Hearing and Ruling on the Motion To Suppress**

Mr. Little moved before trial to suppress the confession on the grounds that he had not voluntarily waived his *Miranda* rights or voluntarily confessed. No witnesses testified at the suppression hearing, but the court reviewed several segments of the videotape of the interrogation in open court. The court also indicated that prior to the hearing it had reviewed most of the videotaped interrogation—at least "a couple hours of it"—which appeared to include all of the portions leading up to the confession. The trial court denied the motion to suppress, ruling that Mr. Little had voluntarily waived his rights and that his confession was voluntary. The court made no specific comments or findings about the detectives' references to the risk of being sexually assaulted in jail or to Mr. Little's need to confess before meeting with his attorney, but noted more generally that the officers engaged in no physical violence; that they offered Mr. Little food, drink, and an opportunity to use the bathroom; and that Mr. Little appeared "focused," "able to engage," and "had his wits about him."

**C. The Trial and Post-Conviction Proceedings**

At trial, the government presented evidence that Camilla Deline was assaulted by two young men who tried to take her car and who left behind a cell phone that belonged to Mr. Little. Neither Ms. Deline nor her daughter could

identify Jolonta Little as one of the carjackers, but the jury heard evidence that Mr. Little had confessed to the crime. After a three-day trial, the jury found Mr. Little guilty of carjacking, robbery, and aggravated assault.

In his brief on appeal, Mr. Little challenged the denial of his motion to suppress on grounds that his waiver of his *Miranda* rights was involuntary, that his *Miranda* rights were violated when police ignored his assertion of his right to counsel later during the interrogation, and that his confession was rendered involuntary by various coercive tactics. After the government argued in its response that Mr. Little had waived his claim that he invoked his right to counsel by failing to raise the issue in the trial court, we stayed the appeal while counsel for Mr. Little filed a motion in the trial court alleging that Mr. Little's trial counsel was ineffective in that regard. The trial court denied that motion, ruling that trial counsel was not ineffective in failing to raise the claim at the suppression hearing because Mr. Little did not unambiguously invoke his right to counsel during the interrogation. The court noted that "at best, a reasonable police officer would have understood that the suspect might be invoking the right to counsel" and that "he wanted a lawyer present before answering any more questions." But Mr. Little might also have merely been "asking about his lawyer's whereabouts or whether one had been provided" so that he could evaluate the detectives' offer to work out a deal after Mr. Little confessed.

## II.

Mr. Little contends in this now consolidated appeal that the trial court should have suppressed his statements because, among other reasons, they were involuntary and obtained in violation of his Fifth Amendment rights.

Before a confession may be admitted in evidence, the government bears the burden to prove by a preponderance of the evidence that a defendant's statements were given voluntarily. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). "The test for determining the voluntariness of specific statements 'is whether, under the totality of the circumstances, the will of the [suspect] was overborne in such a way as to render his confession the product of coercion.'" *United States v. Turner*, 761 A.2d 845, 854 (D.C. 2000) (quoting *Arizona v. Fulminante*, 499 U.S. 279 (1991)). In deciding whether a suspect's will was overborne, the court evaluates the nature of the interrogation—including "its duration and intensity, the use of physical punishment, threats[,] or trickery, and whether the suspect was advised of his rights"—as well as the characteristics of the accused—including his age, education, prior experience with the law, and physical and mental condition. *In re J.F.*, 987 A.2d at 1177 (quoting *Graham v. United States*, 950 A.2d 717, 730 (D.C. 2008)). "Whether appellant's statements were voluntary is a question of law subject to de novo review on appeal, with the appropriate deference to the trial

court's factual determinations." *Graham*, 950 A.2d at 735. "[A]n involuntary statement is inadmissible at trial for any purpose." *Turner*, 761 A.2d at 853.

## III.

The facts most pertinent to the voluntariness issue in this case—those contained in the video recording of the interrogation—are undisputed,[7] and a close examination of the course this interrogation took leads us to conclude that the government has not established the voluntariness of Mr. Little's confession. We reach this conclusion based on the totality of the circumstances, but focusing particularly upon the detectives' threatening statements about the possibility Mr. Little would be sexually assaulted in jail if he did not confess and their suggestions that he could not meet with a lawyer until he put "some meat" "on the table." Our determination that his ultimate confession was involuntary is bolstered in part by the unusual coerciveness of the detectives' repeated threats to pursue charges against Mr. Little for offenses they openly indicated they did not suspect him of committing.

---

[7] *See Turner v. United States*, 116 A.3d 894, 936-37 (D.C. 2015) (reviewing a videotaped interrogation for evidence of coercion or lack of voluntariness); *Hood v. United States*, 28 A.3d 553, 564 (D.C. 2011) (deferring to "the trial court's reasonable determination of disputed facts" and analyzing "[w]hether the established or uncontested facts suffice to demonstrate the requisite degree of materiality").

About two hours into the videotape of the interrogation, after Mr. Little had repeatedly and steadfastly denied involvement in the carjacking, Detective Crespo resorted to a strategy that differed from the methods the two detectives had employed up to that point. He asked Mr. Little if he knew what had happened to a man named Wee Wee "when he got locked up"—"you know he's an adult now." Detective Crespo suggested that Mr. Little needed to confess to avoid "what happened to" Wee Wee, which is that "[t]he day Wee Wee went to jail"—stressing loudly that this happened *the day* Wee Wee arrived—"[s]omebody sexually assaulted him." Mr. Little told the officers that Wee Wee was his godbrother, and Detective Crespo asked Mr. Little again if he had "heard what happened to him"— that "[s]omebody tried to sexually assault him." Underscoring the connection between confessing and steering clear of Wee Wee's fate, Detective Crespo said "[t]hat's not how you want to live your life," "[y]ou ain't no Wee Wee," and "that's no place for you to be." These statements echoed the detectives' previous comments in which he urged Mr. Little to give police "an opportunity to help you instead of incarcerate you" and noted that "now you're going to be sitting there in jail with a whole bunch of grown men because . . . you didn't want to say anything."[8]

---

[8] Other comments in this same vein appeared to exploit Mr. Little's youth,

(continued…)

"[C]ertain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause." *Miller v. Fenton*, 474 U.S. 104, 109-110 (1985) (noting that the Supreme Court "has continued to measure confessions against the requirements of due process" as well as the Fifth Amendment privilege against self-incrimination); *see also Colorado v. Connelly*, 479 U.S. 157, 163 n.1 (1986) (listing types of coercive psychological and physical pressures that have arisen in Supreme Court cases). A detective's comments urging a teenage suspect to confess in order to avoid the fate met by a similarly situated godbrother who was also new to the adult criminal justice system—being sexually assaulted when he got to the jail—is such a technique. The government commendably acknowledges problems with how police questioned Mr. Little, its counsel stating at oral argument "personally and on behalf of the United States" that it was "not a proud moment in the interrogation of any defendant" when the detectives raised the specter of this teenage suspect being sexually assaulted in jail. Besides not being a proud moment, the tactic is akin to the coercive interrogations in *Arizona v. Fulminante*, 499 U.S. at 287-88, where the

---

(…continued)
painting a picture of Mr. Little, "basically as a juvenile yourself," "sitting in jail . . . with a whole bunch of dudes" and reminding him that "you're 18 now" and that the adult system is very different from the juvenile system.

Supreme Court held that an offer to protect Fulminante from fellow inmates only if he confessed—which the court characterized as "a credible threat of physical violence"—rendered the confession involuntary, and in *Payne v. Arkansas*, 356 U.S. 560, 564-67 (1958), where the interrogating officer's promise to protect the suspect from a vengeful mob of people outside the jailhouse door if he confessed produced an involuntary confession. "Physical violence or threat of it by the custodian of a prisoner during detention serves no lawful purpose, invalidates confessions that otherwise would be convincing, and is universally condemned by the law. When present, there is no need to weigh or measure its effects on the will of the individual victim." *Stein v. New York*, 346 U.S. 156, 182 (1953), overruled in part on other grounds by *Jackson v. Denno*, 378 U.S. 368 (1963).

The threat of physical violence the detectives posed here was decidedly credible. The kind of sexual assault Detective Crespo told Mr. Little he risked had happened very recently to someone Mr. Little knew well, on the day he was sent to jail, in circumstances similar to those in which Mr. Little found himself and, according to Detective Crespo, it could well happen to Mr. Little if he did not confess. Mr. Little was in some respects uniquely susceptible to coercion of this sort given his youth, his inexperience in the adult system (like Wee Wee, who was "an adult now"), and how close to home this threat involving his own godbrother hit. *See Brisbon v. United States*, 957 A.2d 931, 945 (D.C. 2008) (stating that

interrogation tactics are more likely to be coercive when they are "used on a suspect particularly susceptible to police pressure"). Detective Crespo made a point of noting that Mr. Little was "not as hard" as Wee Wee, yet even Wee Wee had become the victim of sexual assault.

Immediately after Mr. Little was threatened with the prospect of being sexually assaulted in jail, the officers' coercive tactics culminated when Detective Crespo told Mr. Little that unless he confessed, he could not have a lawyer assist him in making a deal with the government. This colloquy, which ended with a confession, began when Mr. Little asked Detective Crespo when he was going to get the arrest warrant signed:

> DETECTIVE CRESPO: If you tell me what happened, I can promise you this. I'm not going to get that shit signed today. We're going to sit and meet with your attorney before you tell me—before I get an arrest warrant for you.
>
> JOLONTA LITTLE: So where my attorney at?
>
> DETECTIVE CRESPO: You pick one after you go to arraignment. If you want, I can set up a meeting for you, your attorney, the prosecutor and us, but before that happens, I got to have a reason for that to happen, and that reason is going to have to be you telling me what happened that day when that lady got robbed.
>
> JOLONTA LITTLE: See, but I'm trying to have that meeting set up though.

DETECTIVE CRESPO:  I promise you that meeting will get set up, but in order for that meeting to happen, I need to know something. . . .  I need to have some meat to put on the table before I set up a meeting.

The upshot of Detective Crespo's statements was that Mr. Little's right to a lawyer in the circumstances in which he found himself was conditioned on his confessing.  That is, contrary to Detective Crespo's earlier assurance that Mr. Little had "the right to talk to a lawyer for advice before [police] question[ed him]" and to have the lawyer "with [him] during questioning," here Detective Crespo made clear that the meeting Mr. Little was "trying to have . . . set up" with his lawyer would not happen unless he confessed, and that in any event—confession or no confession—he would not see a lawyer until "after . . . arraignment."  Any assumption of continued voluntariness that stemmed from Mr. Little's signing of the *Miranda* rights form faded when the police redefined his right to consult with counsel by imposing very real restrictions on that right—not until "after . . . arraignment," and not until he put "some meat . . . on the table."  Such "wrongful disregard of [a suspect's] rights and persistent badgering" are "unquestionably coercive in nature." *Dorsey v. United States*, 60 A.3d 1171, 1203 (D.C. 2013) (en banc); *see also Bond v. State*, 9 N.E.3d 134, 141 (Ind. 2014) (holding that intentionally misleading a suspect regarding his constitutional rights to a fair trial and an impartial jury rendered that suspect's confession involuntary).

The trial court agreed, in ruling on Mr. Little's motion under D.C. Code § 23-110 (2012 Repl.), that Mr. Little was asking "whether [a lawyer] had been provided" so that he "could evaluate the officer's offer" to "hold off getting an arrest warrant . . . before the detectives had a discussion with his lawyer, presumably to work out a cooperation deal." Yet what the videotape also shows is that the negotiation was going on right then, during the interrogation, and that Detective Crespo was urging Mr. Little not just to confess but to "work out a deal." As Mr. Little's interrogator was pressing him to make a deal, Mr. Little appeared interested in exploring that deal with a lawyer right then. The pressure had mounted since he waived his rights, and he no longer wanted to go it alone. For purposes of the voluntariness analysis, even if Mr. Little did not unambiguously invoke his right to counsel,[9] he was at the very least making clear, before he

---

[9] While we need not decide that Mr. Little invoked his right to counsel in order to conclude that the detectives' handling of his question about his attorney was misleading and coercive, Detective Crespo's response to the question "[s]o where my attorney at?" is illuminating. The detective's reply that "[y]ou pick one after you go to arraignment" suggests that he perceived Mr. Little not to be asking *where* his attorney was, but whether he could get that attorney now. The answer, Detective Crespo signaled, was plainly no. "Where the officer understands that the suspect has asserted his right to remain silent, the fact that someone else could have believed otherwise, or been confused, is irrelevant." *Stewart v. United States*, 668 A.2d 857, 864 (D.C. 1995). Mr. Little's statements conveyed essentially the same message as the statement the Supreme Court assumed was an invocation of rights in *Edwards v. Arizona*, 451 U.S. 477, 479 (1981): "I want an attorney before making a deal."

confessed, by asking Detective Crespo about his attorney and by "trying" to "set up" the kind of meeting Detective Crespo proposed, that he wished an attorney were there to help him "work out a deal" with the police and the prosecutor. The detective's indication that Mr. Little had to confess first and consult with counsel later was part and parcel of the pressure that produced a confession almost immediately thereafter. This coercion was exacerbated when Detective Crespo wrapped up the discussion similar to how he began it, with a promise not to charge Mr. Little "as of right now" if he confessed: "And you promise me that?" Mr. Little asked, to which Detective Crespo responded, "Yeah I promise you that."[10]

Even if the detectives' sexual assault references were not inherently coercive, the videotape shows how efficiently the combination of this tactic and the detectives' statements about meeting with a lawyer broke down Mr. Little's at first unmistakable determination not to incriminate himself and thus supports a conclusion that these tactics had an actual coercive effect on Mr. Little.[11] *See In re*

_____

[10] The government notes that the promise was qualified and contends in any event that Detective Crespo took it back, but this is unclear from the videotape. Mr. Little began to confess almost immediately after this exchange, and there are some indications later during the videotape, when police are questioning him about other crimes he witnessed or knew about, that he was surprised to learn he would not be released that day.

[11] Courts have recognized a distinction between tactics that are related to the government's evidence of the suspect's guilt—such as a fake lie detector test in

(continued…)

*J.F.*, 987 A.2d at 1177 (holding that J.F.'s sixty-three denials before finally confessing constituted one of four factors leading the court to hold that his confession was involuntary). Even as the detectives increased the pressure, but before they raised the specter of prison rape and indicated he had to confess before he could meet with his lawyer, Jolonta Little repeatedly insisted that he was not involved in the offenses about which he was being questioned: "I don't rob people," "I don't need to rob nobody," "I don't be robbing nobody," "I don't be touching females," "I wasn't in nobody car," "I would never rob nobody up my

---

(…continued)

*Contee v. United States*, 667 A.2d 103, 104 (D.C. 1995), or a deliberate lie about a fellow perpetrator's accusations in *Davis v. United States*, 724 A.2d 1163, 1168 (D.C. 1998)—and tactics that exert pressure on extrinsic grounds, such as threatening a suspect with the loss of her children and federal benefits, *see Lynumn v. Illinois*, 372 U.S. 528, 534 (1963), or falsely telling a suspect that his mother and grandmother had been arrested, *see Brisbon*, 957 A.2d at 944. As this court said in *Brisbon*, a suspect who was completely innocent of the offense in question "might well confess . . . for fear of the extraneous adverse consequences" described in tactics like these. *Id.* at 945. Here, Detective Crespo's comments about the risk of being sexually assaulted at the jail likewise played on Jolonta Little's fear and "distorted [his] rational choice . . . by introducing a completely extrinsic consideration" of the sort that might induce even an innocent defendant to confess. *See Holland v. McGinnis*, 963 F.2d 1044, 1052 (7th Cir. 1992) (describing *Lynumn*, 372 U.S. 528). Having said this, we note that involuntary statements must be suppressed "'whether true or false,'" *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960) (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)), and the involuntariness inquiry must focus not on discerning truth, but on prohibiting conduct that "wrings a confession out of an accused against his will." *Blackburn*, 361 U.S. at 206-07; *see also Lego v. Twomey*, 404 U.S. at 624 ("The use of coerced confessions, whether true or false, is forbidden because the method used to extract them offends constitutional principles.") (citation omitted).

way," "I didn't get in nobody car. I didn't rob no lady," "I'm a Muslim. I wouldn't dare touch no lady in no type of way if she don't want me to," "I ain't robbed nobody," "I didn't. I didn't," "I don't even know about that," "I ain't do it though," "I don't even know what you're talking—" "I don't even rob people anyway," "I ain't robbed nobody, sir," "I ain't touch her, I ain't rob her, I ain't do nothing, you know what I'm saying."

When Detective Crespo told Mr. Little the news about "what happened to [Wee Wee]" "[t]he day [he] went to jail," the change in Mr. Little's bearing was demonstrable. As he shifted in his chair, he stated in a low voice, "[T]hat's my godbrother." Within roughly one minute after the conversation about Wee Wee, Mr. Little made a point of saying that he did not rob anybody "on Georgia Avenue"—as opposed to T Street, the location of the robbery in this case—and then said he "didn't rob that lady" on T Street in a way that suggested he may have been present but was not the actual robber. Shortly thereafter, when Detective Crespo pressed him repeatedly to name his accomplice, he squirmed back in his chair and murmured, "I don't know, man. I don't know, man. I don't know, man," causing Detective Crespo to respond, "Jolonta, you're this close." Moments later, Detective Crespo shifted the conversation to the logistics of meeting with his attorney and making a deal. The imminence of Mr. Little's confession in the wake of these combined strategies bears out their coercive effect.

While the detectives' use of Wee Wee's sexual assault and their handling of Mr. Little's question about his attorney stand out as the most coercive aspects of the interrogation in this case, there were other deceptive tactics in play during Mr. Little's questioning, and our case law instructs us to consider "threats or trickery" in evaluating the nature of the interrogation. *See In re J.F.*, 987 A.2d at 1177. In *Dorsey*, for example, we condemned such "overreaching tactics" as "the detectives' warnings to Dorsey that he would suffer adverse consequences if he insisted on consulting counsel and exercising his constitutional rights, their provision of dubious legal advice to sway Dorsey's judgment, and their suggestions as to what story Dorsey could tell to minimize the gravity of his crimes"—tactics that surfaced to varying degrees in Mr. Little's interrogation. *See* 60 A.3d at 1204 (noting that if Dorsey had "given in and confessed during the first round of his interrogation, we would find it impossible to conclude that he made a voluntary waiver or confession"). "When the officers who question a suspect by using trickery demonstrate an 'undeviating intent . . . to extract a confession . . . the confession obtained must be examined with the most careful scrutiny.'" *Brisbon*, 957 A.2d at 945 (quoting *Spano v. New York*, 360 U.S. 315, 324 (1959)); *Beasley v. United States*, 512 A.2d 1007, 1015 (D.C. 1986) (likewise noting that "[t]he use of deception or trickery by police during an interrogation" is "subject to close scrutiny"). It is true that such deception "does not in and of itself render an

otherwise voluntary confession invalid," *id.*, and our case law is brimming with cases rejecting appellants' voluntariness claims where the interrogating officers exaggerated the evidence against a suspect, for example, or made up evidence altogether. *See, e.g.*, *Dorsey*, 60 A.3d at 1206; *Davis v. United States*, 724 A.2d 1163, 1168 (D.C. 1998); *Contee v. United States*, 667 A.2d 103, 104 (D.C. 1995).

As to many portions of the interrogation, the present case could be added to that body of case law. While the officers here bluntly lied to Mr. Little when they told him that his fingerprints were found on the complainant's vehicle and that several witnesses picked his photo from an array and would identify him at trial, the videotape does not indicate that these falsehoods played a discernible role in inducing Mr. Little's confession, and he continued to firmly deny any involvement in the carjacking: "My fingerprints couldn't have been in the car. I wasn't in no car. I'm going to tell you that now." At another point, Mr. Little admitted that the evidence the detectives claimed they had against him was "enough evidence" and that "it sound like it's me," but "[a]ll I can do is, man, say I ain't do it man . . . all's I can do is what, take it to trial."

But one deceptive tactic—the threat of prosecution of crimes the officers openly admitted they did not think Mr. Little committed, particularly one involving the shooting of a police officer—strikes us as different in kind. The government

contends that Detective Crespo's promise to show Mr. Little's photograph to all the robbery victims in the area was not a threat to Jolonta Little "but an explanation of how the investigation would continue without his confession."  But Detective Crespo's comment that "[m]aybe you didn't do them, but what if they pick you?," his stated intention to pursue these investigations only if Mr. Little did not cooperate, and the detectives' stakes-raising reference to a police officer being shot during one of the unsolved robberies have no ostensible purpose other than to scare Mr. Little with the prospect of being falsely accused of unrelated robberies, perhaps a lot of them, if he did not confess to this carjacking.  *See Holland v. McGinnis*, 963 F.2d 1044, 1052 (7th Cir. 1992).  Although Detective Crespo conceded, "I don't think you shot at a cop," Detective Dailey was quick to inform Mr. Little that the "suspect meets your description."  This kind of pressure to confess is tantamount to the fear of extrinsic adverse consequences that our decision in *Brisbon* recognized could prompt an innocent person to confess.  *See Brisbon*, 957 A.2d at 945; *see also United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009) (stating that it is "necessarily coercive" for the police to engage in "conduct that influences a rational person who is innocent to view a false confession as more beneficial than being honest," so "our task is to examine whether [the suspect] was not able to make a rational decision due to promises made by the interrogating detective").

The government contends in its brief that "the non-coercive nature of the interview is best reflected by appellant's comfort in talking with the detectives." And indeed, numerous factors might suggest, at least on a superficial level, that Mr. Little was not distraught or unnerved. He had experience with the criminal justice system prior to this point, albeit only as a juvenile.[12] He waived his *Miranda* rights.[13] He was not physically touched, he knew that he was being questioned about "robberies," and he was offered food[14] and a bathroom break. He

---

[12] As Detective Crespo told Jolonta Little, "There's a big difference between being an adult and being a juvenile, okay?" There is no indication that Mr. Little had taken part in this kind of stationhouse interrogation before.

[13] That a suspect was advised of his *Miranda* rights is an indication of voluntariness. *See, e.g.*, *In re J.F.*, 987 A.2d at 1177; *United State v. Lopez*, 437 F.3d 1059, 1063-64 (10th Cir. 2006). Mr. Little argues that his waiver was not valid because, among other things, the police made prefatory statements diluting the warnings and rendering them ineffective. The recitation of rights in this case had its coercive elements, ranging from the detectives' attempts to persuade Mr. Little that he had nothing to gain by invoking his right to silence because they already had an airtight case against him and he was "going to get hit with every one we got" unless he offered "some sort of explanation and alibi" to their apparent attempt to distract him with talk of football while he was deciding whether to sign the waiver form. Because we reverse on voluntariness grounds, we need not decide whether the officers' warnings as a whole reasonably conveyed Mr. Little's rights under *Miranda*.

[14] In a totality-of-the-circumstances analysis, it is worth noting that in response to the offer of food, Mr. Little said he was fasting for Ramadan. Police had awakened and arrested Mr. Little early in the morning at his home, so he presumably had not eaten prior to the interrogation and he told police he was not allowed to eat for many hours—not until after 7 p.m. That he was offered food is thus not a strong factor in support of voluntariness, and instead the fact that he told

(continued…)

asked questions of the detectives, sometimes tried to negotiate, played with his hair, and at one point even joked that he would take the detective's phone number and get back with him. While he was confessing, Mr. Little leaned back and twirled his hair.

Behavior is an appropriate consideration, but "a suspect's demeanor is susceptible to many interpretations and cannot be held determinatively against him." *In re J.F.*, 987 A.2d at 1179 n.23. On this record, these considerations—that is, an 18-year-old's seeming intent to betray no weakness or hint of vulnerability to the police officers who otherwise have him chained to the floor—do not satisfy the government's burden to demonstrate the voluntariness of Mr. Little's confession. Even if we read a great deal into his level of engagement with the detectives and assume a familiarity with the adult system based on matters Mr. Little had in juvenile court,[15] the totality of the circumstances surrounding this

_____

(…continued)
the officers he was fasting serves as some evidence that Mr. Little might be affected by hunger and the detectives knew it. *Cf. Colorado v. Connelly*, 479 U.S. at 164-65 (noting that due process is violated when police know of and exploit the deficient mental condition of the defendant).

[15] The trial court noted at the suppression hearing that "[i]t's not clear just because he was arrested, that he has been given warnings," though when Detective Crespo asked him at the beginning of the interrogation, "You've been read your rights before, right? So you know if you agree to talk to me and you say you know what, I don't want to answer that question, you know you can say that, right?," Mr.

(continued…)

interrogation offers no assurance that Mr. Little's confession was uttered voluntarily.

## IV.

The interrogation of suspects "is undoubtedly an essential tool in effective law enforcement," *Haynes*, 373 U.S. at 515, and it is beyond serious question that hard-hitting tactics in and of themselves do not render involuntary any statements elicited by those tactics. *See In re J.F.*, 987 A.2d at 1178 (agreeing with the government "that officers will sometimes need to be aggressive in their investigation of crimes" (internal quotation marks omitted)). Yet in this case, where police were interrogating a teenage suspect who was chained to the floor in a small stationhouse interrogation room, where they instilled in him a fear of being raped in jail, where they played up the risk that he would be prosecuted for myriad robberies they did not suspect him of committing, and where the suspect emphatically denied he had robbed anybody until police told him, when he inquired "So where my lawyer at?," that he had to confess before he could arrange a meeting with his lawyer, the combination of the timing and the nature and

---

(…continued)
Little responded, "Yeah, I know," and said nothing to suggest the detective was wrong in assuming that he had been read his *Miranda* rights before.

intensity of these tactics leads us to the conclusion that the confession was not voluntary, that its centrality to the government's case precludes it from being deemed harmless,[16] and that Mr. Little should have a new trial at which his confession is excluded.

Having concluded that the trial court erred in admitting Jolonta Little's confession at trial, we reverse Mr. Little's convictions and remand this case for a new trial.

*So ordered.*

---

[16] The Supreme Court held in *Fulminante* that the harmless-error rule applies to erroneously admitted coerced confessions, though it further held that "[a] confession is like no other evidence" and that "the risk that the [coerced] confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless." *Fulminante,* 499 U.S. at 296. The government has sensibly not argued here that if Mr. Little's confession was involuntary then its admission was harmless, notwithstanding that Mr. Little twice repeated his confession after the initial interrogation. *See Darwin v. Connecticut*, 391 U.S. 346, 351 (1968) (Harlan, J., concurring in part and dissenting in part) (stating that where the government seeks to use a confession uttered after an earlier involuntary confession, it must prove "not only that the later confession was not itself the product of improper threats or promises or coercive conditions, but also that it was not directly produced by the existence of the earlier confession"); *Johnson v. United States*, 609 A.2d 1112, 1116 (D.C. 1992) (noting that in *Ruffin v. United States*, 293 A.2d 477, 480 (D.C. 1972), this court adopted Justice Harlan's approach to successive confessions).